[No. S037195. July 25, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
JERRY NOBLE KENNEDY, Defendant and Appellant.

COUNSEL

Michael Satris, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Eric L. Christoffersen and Janis Shank McLean, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KENNARD, J.—A jury convicted defendant Jerry Noble Kennedy of one count of murder (Pen. Code, § 187, subd. (a))[1] and one count of robbery (§ 211). The jury found true an allegation that defendant used a firearm in committing the crimes (§ 12022.5, subd. (a)) and a special circumstance allegation that the murder was committed during a robbery (§ 190.2, subd. (a)(17)). The jury returned a verdict of death. The trial court denied defendant's motions for a new trial and for modification of the death verdict, and it sentenced defendant to death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239.)

## I. FACTS AND PROCEEDINGS

### A. Guilt Phase

#### 1. Prosecution's case

Around 4:30 a.m. on March 15, 1993, Janet Madsen and her friend Jay Blaylock were in a car parked under a light at Maxwell's Rest Stop off Interstate 5 in Colusa County. Madsen, who was asleep in the passenger seat, was awakened by the sound of a gunshot coming from the restrooms located 50 to 60 feet from the car. She saw a man come out from the men's side of the restroom, walk briskly down a sidewalk directly towards her, get into a car two parking spaces away from her on her right, and leave. During this time, Madsen was "locked in eye-to-eye contact with this man . . . ."

Madsen then saw a man stagger out of the men's restroom and collapse. As she ran towards the man to try to help him, Blaylock called the police on his cellular phone. Sheriff Deputy Randy Morton arrived five minutes later. Morton ran over to the victim, who was breathing but unable to speak, and

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

radioed for help. When the emergency rescue team arrived approximately 10 minutes later, the victim had stopped breathing.

Deputy Morton interviewed Madsen at the scene. She described the person she saw came out of the restroom as a dark-skinned White male in his early 20's with bushy hair "almost like an Afro." He was wearing Levis and a dark jacket. He left in a brown compact car, which had dents and also had red and possibly blue primer paint. Madsen also gave a description to Deputy Sheriff Hameed Kahn, the second officer to arrive at the scene. Madsen told Kahn that the man who fled was a curly-haired White adult male about five feet eight or nine inches in height, weighing approximately 150 pounds, and wearing a dark-colored sweat shirt with dark-colored pants.

Madsen and Blaylock then left the scene and continued their trip. Later that morning, they stopped in Yreka at the Siskiyou County Sheriff's Department to see if they could be of further help. There, Madsen explained that she had been an eyewitness to a murder and she offered her cooperation in preparing a composite sketch of the man who fled the murder scene. Sergeant Gary Perry worked with Madsen in preparing the sketch. Her responses to a series of questions regarding the suspect's facial features included statements that the suspect's eyes were "large and wide-eyed" and that there "was no facial hair at all." Because Madsen was not satisfied with the depiction of the hair, eyes, and nose on the composite drawing produced by the computerized process, she tried to improve the sketch by drawing on it herself. She remained dissatisfied with the composite drawing, however.

Colusa County Sheriff's Detective David Markss, who had also responded to the scene of the murder, learned that the victim was Glenn Chambers from Linn County in Oregon. Markss obtained from the victim's family a list of his credit cards and their numbers and arranged for them to be "flagged," a procedure by which banks and credit companies would notify the police if someone used the credit cards. On the night of March 16, 1993, the day after the murder, a bank notified Detective Markss that one of the victim's credit cards was being used to hire a limousine in Sacramento. When Markss learned from the limousine service that it was sending a limousine to an address on Dawn Court in Sacramento, he contacted the Sacramento Police Department.

The Sacramento Police Department assembled a team of officers at an intersection near Dawn Court, where Colusa County Sheriff Gerald Shadinger joined them. When a car matching the one descibed by Madsen went by, they followed it to a convenience store, where they detained the car's three occupants, Doreen Westbrook, Jack Beach, and Melody Jean Phillips. Sheriff Shadinger asked Westbrook, "Who shot the guy in Maxwell?" She responded,

"Termite," defendant's nickname. She said that Termite was in an apartment at the Dawn Street apartments and that he was armed with a handgun and a machine gun.

As the police evacuated the neighboring apartments and surrounded the apartment building, a .38-caliber handgun wrapped in a white shirt was thrown from the balcony of the apartment where defendant was. The police announced their presence and ordered everyone out of the apartment. Ron Woods, also known as Ron Mead, was the first to emerge from the apartment, followed 11 minutes later by defendant, and then by Kimberly Crawford. Defendant was arrested. Defendant, then 37 years old, was six feet tall, and had a full mustache and goatee that covered the lower half of his face. Defendant's appearance did not resemble the composite sketch prepared earlier. Both Woods and Crawford informed the police that defendant told them of shooting someone at a restaurant and taking the victim's credit cards. The police later found the murder victim's credit cards in the yard of the apartment and on the balcony next door.

Doreen Westbrook, who had been granted immunity at the preliminary hearing, testified to the events leading up to and immediately after the murder. On the evening of March 15, 1993, after taking drugs with defendant, she and defendant left Sacramento in her car to drive to her mother's house in Rancho Tehama, near Redding, to sell drugs and take her niece to the hospital. They first stopped at the Dunnigan Rest Stop on Interstate 5, where they injected themselves with methamphetamine. As they continued north on Interstate 5, Westbrook and defendant talked about robbing people in restrooms. They next stopped at the Maxwell Rest Stop, where Westbrook went into the women's restroom to change clothes. When she came out of the restroom and returned to her car, she heard a gunshot. As Westbrook started the car so they could "get out of there quick," she saw defendant come out of the restroom pulling a ski mask off his head and walking fast, followed by the victim pleading for help. Defendant got in the car and told Westbrook "drive, girl, drive."

Westbrook drove out of the rest stop. As they continued north, defendant went through the victim's wallet. Commenting, "all of this for 11 bucks," defendant showed Westbrook a separate card case containing the victim's credit cards. When they arrived at her mother's house in Rancho Tehama, Westbrook suggested to her brother and his girlfriend that they use the credit cards. The four of them then drove to Corning and used the credit cards. They left for Chico, used the credit cards again, and finally headed to the Arden Fair Mall in Sacramento, where they again used the credit cards. Thereafter, Westbrook used one of the credit cards to rent a limousine to take herself, defendant, and some of their friends to breakfast at a restaurant. She paid with the murder victim's credit card.

That evening, Westbrook again used the victim's card in renting a limousine. When the limousine was late in arriving, she drove to a convenience store to telephone the limousine service; at that point, the police apprehended her. Later that night, she told Sacramento Police Officer Jim Bell that defendant was the killer. A couple of days later, Westbrook traveled to Colusa County, where she spoke to the police. She first told the police in the interview that a Billy Jinks, "one of the North Sac dope fiends," did the killing. She then told the police that defendant "killed the man." Westbrook initially blamed the killing on Jinks because defendant had called her the night before from the Colusa County Jail and told her to lie and because her brother-in-law, George Westbrook, had threatened her by telling her: "If you don't ride the manslaughter you're not coming out of Colusa alive."

After defendant's arrest and arraignment, Janet Madsen, the eyewitness who had given the police a physical description of the killer, saw a newspaper article about the murder with a photograph of defendant's face with a beard. She was concerned that, having described the person she had seen at the rest stop to the police as having no facial hair, the police had arrested the wrong man. On April 7, 1993, Madsen and her friend Jay Blaylock drove to the City of Colusa to discuss the discrepancy with the police.

Madsen told Colusa County Sheriff's Detective Troughton that the newspaper photograph disturbed her because of the eyes and the beard. (Shortly after the murder, she had described the person at the rest stop as a clean-shaven man with large eyes.) Detective Troughton then showed Madsen a picture of defendant without a shirt on that disclosed tattoos on his chest of a swastika, a gun, and the name of his motorcycle gang. Madsen could not make an identification from this picture because it did not show defendant's eyes, which were downcast in the photograph. Madsen was then shown a videotape of defendant's arrest. When Madsen saw defendant's eyes as he looked up on the videotape, she said: "Oh, my God, that's him, and I don't know how I missed that beard." Madsen was next escorted to the police garage, where she identified Doreen Westbrook's car as the car in which she saw the killer flee the scene of the murder. At trial, Madsen positively identified defendant as the man she saw come out of the restroom at the time of the shooting.

## 2. *Defense case*

Manuel Acosta, a truck driver, was at the Maxwell Rest Stop at the time of the murder. He said he was awake and had a clear view of the restroom area from the cab of his truck when he heard a gunshot. He then saw a man come out of the restroom with the victim just behind him. Acosta described the man to the police as being between five feet eight inches and six feet in height,

slender, Hispanic, and with a clean-shaven face. When shown a photograph of defendant by a defense investigator before trial and asked if the photograph was of the person he saw leave the murder scene, Acosta responded: "No way." On cross-examination by the prosecution, Acosta said he could not be absolutely positive defendant was not the man he saw come out of the restroom because he did not see the man's face, but he then testified on redirect examination that defendant was "not the right person" and that the right person is "walking the streets right now."

According to Debra Jewel Matthews, Doreen Westbrook told her she committed the murder. Janet Chissney testified that Doreen Westbrook came by her house in a limousine at 7:00 a.m., was very nervous, and said, "I did it this time, Janet, I did one."

Dina McKee testified that defendant and a John Hancock, also known as Hoss, stayed overnight at her house the night of March 14–15, 1993, and that she had gone to bed with defendant between 10:00 and 11:00 p.m., but that defendant had left after she had fallen asleep. McKee's friend, Susan Nuckols, who lived six houses away from her, testified that between 4:00 and 4:30 a.m. that same night she went to McKee's house to return some books she had borrowed, and that defendant and Hoss answered her knock on the door and took the books.

## B. *Penalty Phase*

### 1. *Prosecution's case*

Larry Chambers, the brother of murder victim Glenn Chambers, testified that the victim was the father of two daughters, one who was then 24 years old and one who was then five years old; that he was a real estate agent and a substitute teacher; that he had been in the military reserves for 20 years; and that their mother was distraught over the killing. Zoe Chambers, the victim's 24-year-old daughter, expressed her love for her father and described her feelings of anger and sense of loss.

Sharon Galiano testified that in 1985 she and her then four-year-old daughter were the victims of a residential robbery committed by defendant. She related that defendant and another man came into her house with a gun, held her at gunpoint, and went through the house stealing items.

Marilyn Ouye, a custodian of records for the Department of Corrections, testified to defendant's criminal history as shown by department records. (§ 969b.) The records showed that defendant had four prior felony convictions: two involving the possession of illegal firearms, one for residential

robbery, and one for possession of controlled substances. Between 1982 and 1993, defendant remained out of prison for only 24 months, and out of those 24 months he was in local custody for a total of 515 days. Defendant was released on parole on March 5, 1993, 10 days before the murder in this case.

### 2. *Defense case*

Buford Kennedy, one of defendant's older brothers, testified that his family moved around when they were children, and that the children were separated from each other when they were young. He expressed the hope that defendant would be sentenced to life without possibility of parole instead of being given the death penalty. Buford admitted that he had suffered six felony convictions and that he was in custody for a parole violation at the time he testified.

Hank Kennedy, another one of defendant's older brothers, testified that he and his brothers were wild when they were growing up, that they were separated when defendant was nine or 10 years old, and that he and his brothers are outlaws. He did not believe defendant committed the murder because defendant would have told him if he had, and he asked the jury to give defendant life without possibility of parole, sparing defendant's life. Hank admitted that he had been convicted of seven or eight felonies, and that he and defendant, while in prison together, had been involved in fights with other inmates.

Defendant testified on his own behalf. He denied committing the murder, and he denied being at the rest stop the night of the killing. Defendant told the jury that he believes in the death penalty and that because the jury had found him guilty it should give him the death penalty. He mentioned that while incarcerated at Folsom Prison he taught his wife's young son how to read and write. He admitted his four prior felony convictions. He acknowledged having spent most of his adult life in prison and sharing membership with his brothers in an outlaw motorcycle group called the "Sacramaniacs." Defendant denied that he told others he had shot a man at a rest stop, but he admitted telling Rochelle Hendricks (the girlfriend of Doreen Westbrook's brother) that he hurt a man at a rest stop so badly that the man had to be taken away in an ambulance.

### II. Guilt Phase

### A. *Identification of Defendant*

Defendant contends that his right to due process of law under the Fourteenth Amendment to the United States Constitution and article I, section

15 of the California Constitution were violated when the trial court admitted evidence of eyewitness Janet Madsen's pretrial and in-court identification of him as the perpetrator.

■ "In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

### 1. *Standard of review*

This court has not decided the standard of review applicable to a claim that an identification procedure was unduly suggestive. It remains "unsettled whether suggestiveness is a question of fact (or a predominantly factual mixed question) and, as such, subject to deferential review on appeal, or a question of law (or a predominantly legal mixed question) and, as such, subject to review de novo." (*People v. Gordon* (1990) 50 Cal.3d 1223, 1242 [270 Cal.Rptr. 451, 792 P.2d 251]; see *People v. Ochoa* (1998) 19 Cal.4th 353, 413 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *People v. Carpenter* (1997) 15 Cal.4th 312, 367 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Defendant contends that the independent standard of review de novo applies. We agree.

■ It is settled that the abuse of discretion standard applies to questions of pure fact, and that the independent review standard applies to questions of pure law. (*People v. Cromer* (2001) 24 Cal.4th 889, 893–894 [103 Cal.Rptr.2d 23, 15 P.3d 243].) The issue of which standard of review governs arises when, as here, the decision under review involves a mixed question of law and fact. ■ Mixed questions of law and fact are those where the facts are established, the law is undisputed, and the issue is whether the law as applied to the established facts is violated. (*Id.* at p. 894.) The constitutionality of an identification procedure presents a mixed question of law and fact. (*Sumner v. Mata* (1982) 455 U.S. 591, 597 [71 L.Ed.2d 480, 102 S.Ct. 1303].)

The mixed question presented in reviewing identification procedures is similar to the mixed questions the United States Supreme Court has determined are subject to independent review. For instance, in *Thompson v.*

*Keohane* (1995) 516 U.S. 99 [133 L.Ed.2d 383, 116 S.Ct. 457], the high court held that the independent review standard applied to a determination of whether a defendant was in custody for purposes of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]. The court reasoned that credibility determinations, although they could contribute to deciding the facts of what had already happened, were not dispositive of the inquiry because the trial court did not have a "first-person vantage" as the facts occurred outside of court. (*Thompson v. Keohane, supra*, 516 U.S. at p. 113.) It also noted that the "in custody" determination by appellate courts would serve to guide future decisions (*id.* at p. 114) because the creation of a body of legal precedent over time would define the legal principles and their application. In *Ornelas v. United States* (1996) 517 U.S. 690 [134 L.Ed.2d 911, 116 S.Ct. 1657], the high court held that the appellate courts should independently determine whether there was reasonable suspicion and probable cause to make a warrantless search. The court there identified in support of its holding the risk of inconsistent results arising not from different facts but from different trial judges drawing varying general conclusions, the need for appellate courts to control and clarify legal principles when the legal rules are defined through their application to facts in different cases, and the ability to come closer to developing a defined set of rules. (*Id.* at p. 697.)

Those considerations apply with equal force to the question of whether a pretrial identification procedure was unduly suggestive. Although the determination of the historical facts, which are reviewed under a deferential standard (*People v. Cromer, supra*, 24 Cal.4th at p. 900), may involve a credibility determination, the decision whether those facts demonstrate that the identification procedure was unduly suggestive does not require such a determination. In determining whether a pretrial identification was unduly suggestive, a trial judge does not have a "first-person vantage." Pretrial identification procedures, like determinations of reasonable suspicion and probable cause, occur outside of the courtroom. Independent appellate court evaluation of whether an identification procedure was or was not unduly suggestive would also help to develop a defined set of rules by establishing a body of legal precedent that provides guidance.

■ Accordingly, and consistent with "this court's usual practice for review of mixed question determinations affecting constitutional rights" (*People v. Cromer, supra*, 24 Cal.4th at p. 901), we conclude that the standard of independent review applies to a trial court's ruling that a pretrial identification procedure was not unduly suggestive.

### 2. *Analysis*

Defendant filed a motion before trial to suppress Janet Madsen's pretrial identification of him as the perpetrator. The evidence presented at the pretrial

hearing on defendant's motion was essentially repeated at trial as part of the normal presentation of evidence to the trier of fact and has been summarized, above. In ruling on the motion, the trial court made these findings: After seeing a newspaper article containing a picture of defendant, Madsen decided to go to the Colusa County Sheriff's Department with the article to express doubt that the person pictured in the newspaper was the man she saw at the time of the murder; she was shown the photograph of defendant without his shirt on and she asked to see a photograph in which defendant's eyes showed; when she was shown the videotape of defendant's arrest and she saw defendant's eyes, she exclaimed, "That's him."

The trial court denied the motion, ruling that the police did not use an unduly suggestive identification procedure. In support, the court cited *Neil v. Biggers* (1972) 409 U.S. 188 [34 L.Ed.2d 401, 93 S.Ct. 375], which both parties agreed was the controlling authority. The United States Supreme Court there held identification evidence was admissible "even though the confrontation procedure was suggestive" if the evidence was nevertheless reliable under the totality of circumstances. (*Id.* at p. 199.) It identified the factors to be considered in determining the reliability of the identification as including "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." (*Id.* at pp. 199–200; see *People v. Cunningham, supra,* 25 Cal.4th at p. 989; *People v. Ochoa, supra,* 19 Cal.4th at p. 412.)

Defendant contends that the admission of Janet Madsen's testimony identifying him as the perpetrator violated his state and federal constitutional due process rights to a fair trial. Admission of the identification evidence is error only if the identification procedure was unduly suggestive and unnecessary and it is unreliable under the totality of circumstances. (*People v. Ochoa, supra,* 19 Cal.4th at p. 412.)

Defendant claims that the identification was unduly suggestive and unreliable. We conclude that the identification evidence was admissible as reliable under the totality of circumstances, taking into account such factors as those the high court identified in *Neil v. Biggers, supra,* 409 U.S. at page 199.

Janet Madsen had a good opportunity to view the perpetrator at the time of the crime. While parked in a car outside the restroom, Madsen heard a gunshot; she then saw a man come out of the restroom and walk towards her, coming to within five to 10 feet of her. Madsen was parked under a light, and she was "locked in eye-to-eye contact" with the man for 30 to 60 seconds.

Madsen's description to the police made no mention of the man's prominent beard, and the composite drawing prepared by the police with her help depicted no facial hair and bore little resemblance to defendant. When she later saw defendant's photograph in the newspaper showing him with a beard, she was concerned that the wrong man had been arrested, and she drove to the City of Colusa to discuss the discrepancy in appearance with the police.

When police showed Madsen a photograph of defendant with his shirt off, she was uncertain he was the man she had seen come out of the restroom after the shooting. She could not clearly see the man's eyes in the photo. She explained that the man she had seen come out of the restroom came within a few feet of her, and she focused on his eyes. When the police later showed her the videotape of defendant's arrest, however, her identification of defendant was quite positive. On seeing defendant's eyes, Madsen exclaimed: "Oh, my God, that's him, and I don't know how I missed that beard." Her identification of defendant at the pretrial hearing and at trial was also certain. At trial, Madsen testified, "I just kept saying, 'I don't believe I missed the beard, I don't believe it,' " and "Oh, my God, that's the man." Finally, we note that the length of time between the crime and the identification was only three weeks.

After considering the totality of circumstances discussed above, we conclude that Madsen's identification of defendant was reliable and that the trial court did not err in admitting the identification testimony at trial.

B. *Admission of Evidence*

1. *Claims of coerced testimony*

Defendant contends that his due process right to a fundamentally fair trial was violated by the admission into evidence of coerced testimony. He first challenges as coerced a statement to the police by Doreen Westbrook that defendant shot the victim.

At trial, the prosecutor asked Sheriff Shadinger what he said to Westbrook and her response when she was arrested at the convenience store. When the defense interposed a hearsay objection, the prosecutor replied that the testimony was not being offered for the truth of the matter asserted, but to explain the conduct of the police after Westbrook's arrest. The trial court admonished the jury to consider the testimony only for the limited purpose of showing what the officers did when they learned that Westbrook identified defendant as the person who had shot the victim. Sheriff Shadinger then testified that when he asked, "[w]ho shot the guy in Maxwell?" Westbrook replied "Termite," defendant's nickname.

The Attorney General argues that defendant may not claim on appeal that the testimony was inadmissible as coerced because he did not object at trial

to its admission on that ground. (See *People v. Ervin* (2000) 22 Cal.4th 48, 84 [91 Cal.Rptr.2d 623, 990 P.2d 506].) We agree.

██ "[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal.' [Citations.] This applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights. [Citations.]" (*In re Seaton* (2004) 34 Cal.4th 193, 198 [17 Cal.Rptr.3d 633, 95 P.3d 896].) This rule applies equally to any claim on appeal that the evidence was erroneously admitted, other than the stated ground for the objection at trial. When an objection is made to proposed evidence, the specific ground of the objection must be stated. The appellate court's review of the trial court's admission of evidence is then limited to the stated ground for the objection. (Evid. Code, § 353.) Here, defendant objected at trial to the prosecutor's questions to Sheriff Shadinger on the ground of hearsay, not on the ground of coercion, the claim raised on appeal. Thus, the claim that Westbrook's statement to the police was coerced is not properly before us. In addition, Sheriff Shadinger's testimony was offered to explain the conduct of the police after the arrest, and the court immediately instructed the jury that the testimony was admitted not for its truth but only to show what the police did after learning that Westbrook had identified defendant as the person who shot the victim.

██ Defendant next challenges as coerced Doreen Westbrook's trial testimony. He argues that the grant of immunity to Westbrook was conditioned on her testimony at trial being in conformity with her earlier statement to the police. Such a conditional grant of immunity to an accomplice is a denial of a defendant's right to a fair trial if the prosecution's case relies substantially on the accomplice's testimony. (*People v. Riel* (2000) 22 Cal.4th 1153, 1179 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Allen* (1986) 42 Cal.3d 1222, 1251 [232 Cal.Rptr. 849, 729 P.2d 115].)

██ The Attorney General correctly asserts that defendant forfeited this claim by failing to object to Westbrook's testimony at trial as coerced. (Evid. Code, § 353.) A claim of coercion is not cognizable on appeal in the absence of an objection to the testimony at trial. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 489 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Riel, supra,* 22 Cal.4th at pp. 1178–1179.) In requiring an objection at trial, the forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error. (*In re Seaton, supra,* 34 Cal.4th at pp. 198–199.) Here, defendant forfeited his claim of coerced testimony because of his failure to object at trial. Moreover, the claim lacks merit, as discussed below.

Westbrook was granted immunity during her testimony at the preliminary hearing. When she was about to incriminate herself, the trial court admonished her of her constitutional rights to remain silent and to be represented by an attorney. When she asked for an attorney, the court appointed Attorney Lorie Ruminson, who was in the courtroom at the court's request. After a recess, Westbrook invoked her right to remain silent, and the prosecutor petitioned the court to grant Westbrook immunity. The court granted the petition.

The order said: "Westbrook shall not be prosecuted or subjected to penalty or forfeiture for or on account of those facts and acts concerning her involvement with defendant, Jerry Noble Kennedy, as set forth in the accompanying petition and declaration." The accompanying declaration included as an attachment Westbrook's statement to Colusa County Sheriff's Detective Markss describing Westbrook's involvement with defendant immediately before, during, and immediately after the murder, and her identification of defendant as the killer. Westbrook's testimony at trial was consistent with her earlier statement.

The prosecutor at trial described the immunity as transactional immunity. "Transactional immunity protects the witness against all later prosecutions relating to matters about which [the witness] testifies." (*People v. Hunter* (1989) 49 Cal.3d 957, 973, fn. 4 [264 Cal.Rptr. 367, 782 P.2d 608].) Use immunity, on the other hand, "protects a witness only against the actual use of [the witness's] compelled testimony, as well as the use of evidence derived therefrom." (*Ibid.*) Here, the immunity granted Westbrook extended to all matters that were the subject of her testimony and thus was transactional immunity. It did not require Westbrook's testimony at trial to conform to any statement given the police. In addition, the immunity order does not state that it is conditioned on conforming testimony.

Neither the order granting immunity nor the record shows that the immunity granted to Westbrook at the preliminary hearing was conditioned upon Westbrook conforming her testimony to her earlier statement to Detective Markss of the Colusa County Sheriff's Department.

2. *Claims relating to the admission of evidence*

Defendant challenges four evidentiary rulings by the trial court.

a. *Hearsay objection to Doreen Westbrook's testimony*

Defendant contends the trial court should not have overruled his hearsay objection to certain testimony by prosecution witness Doreen Westbrook. On

direct examination, Westbrook testified without objection by the defense that she had lied to the police when she was first questioned in Colusa County a couple of days after her apprehension. In that interview, she said that a person named Billy Jinks had committed the murder. She explained she had lied because defendant had called her from the Colusa County Jail and told her to say that Billy Jinks had taken her car and to lie to the police. On cross-examination, the defense sought to impeach Westbrook by, among other things, suggesting that her statements implicating defendant were the result of threats of prosecution, that she could not remember what she said when she made statements the night she was arrested because she was intoxicated on drugs at the time, and that her trial testimony was influenced by the immunity order.

On redirect examination, the prosecution asked Westbrook to tell what she said to her friend Debbie Matthews and to Matthews's husband. When Westbrook started to say that she told them defendant had called her on the telephone, the defense objected on the ground of hearsay and the prosecution responded that the testimony was admissible as a prior consistent statement. The trial court overruled the objection. Westbrook then said she told Matthews and her husband that defendant had telephoned her and told her that she "was to put it off on Billy Jinks, it would be better off for [her] health if [she] did."

■ A prior consistent statement is admissible as an exception to the hearsay rule if it is offered after admission into evidence of an inconsistent statement used to attack the witness's credibility and the consistent statement was made before the inconsistent statement, or when there is an express or implied charge that the witness's testimony was recently fabricated or influenced by bias or improper motive, and the statement was made before the fabrication, bias, or improper motive. (Evid. Code, §§ 791, 1236.)

Defendant contends the trial court erred in allowing Westbrook's testimony on redirect examination because the defense did not imply in cross-examining Westbrook that her testimony about the telephone call was fabricated. We disagree. As the Attorney General points out, Evidence Code section 791 permits the admission of a prior consistent statement when there is a charge that the testimony given is fabricated or biased, not just when a particular statement at trial is challenged. (E.g., *People v. Andrews* (1989) 49 Cal.3d 200, 210–211 [260 Cal.Rptr. 583, 776 P.2d 285]; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1208–1209 [249 Cal.Rptr. 71, 756 P.2d 795].) On cross-examination, defendant attacked Westbrook's credibility by suggesting that her testimony on direct examination implicating defendant was biased or fabricated because of threats of prosecution made by the police and the district attorney, because she was intoxicated, and because she was granted

immunity. Accordingly, Westbrook's prior consistent statements were admissible to rehabilitate her and to support her credibility.

### b. *Relevancy objection to Doreen Westbrook's testimony*

The trial court admitted testimony by Doreen Westbrook of what George Westbrook, her brother-in-law, told her before she went to the City of Colusa to be interviewed by the police. Defendant contends the testimony was irrelevant. We disagree.

Three days after the police apprehended Doreen at a convenience store, the police in Colusa County interviewed her. At that time she gave the police two different statements regarding the murder. In the first of these statements, she identified one Billy Jinks as the killer. In the second statement, made that same day, she told the police that defendant was the killer.

At trial, after testifying on direct examination by the prosecution about the telephone call she received from defendant telling her to identify Billy Jinks as the killer, Doreen was asked what her brother-in-law George Westbrook said to her before her interview by the police in Colusa County. The defense objected on the ground of hearsay. The prosecutor replied that the testimony was being offered to show Doreen's state of mind when she made the first statement to the police identifying Billy Jinks and not defendant as the killer. At defendant's request, the trial court instructed the jury that it could not consider the testimony for its truth but only to understand Doreen's conduct based on what she had been told by her brother-in-law George Westbrook. She then testified that after George "stripped all of my jewelry off me," he told her, " 'If you don't ride the manslaughter you're not coming out of Colusa alive.' " She said this scared her.

Defendant contends this testimony was irrelevant and thus inadmissible. Because defendant did not object on this ground, he is now precluded from asserting this claim. (Evid. Code, § 353.) In any event, the evidence was relevant. Evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact of consequence, including evidence relevant to the credibility of a witness. (Evid. Code, §§ 210, 780.) The testimony in question was relevant to establishing Doreen's credibility. It tended to show that her statement to the police identifying Billy Jinks as the killer instead of defendant was false and that her testimony at trial that defendant was the killer was true. The trial court therefore did not err in admitting the testimony.

### c. *Hearsay objection to Detective Troughton's testimony*

Detective Clinton Troughton read from his police report a statement by Doreen Westbrook's brother, Robert Duclos (also known as Robert Lenore),

as to defendant's explanation about his possession of the murder victim's credit cards. Defendant argues that the trial court erred in allowing this testimony as a prior consistent statement, an exception to the hearsay rule. We reject defendant's challenge, for the reasons given below.

After the killing, defendant and Doreen Westbrook drove from the Maxwell Rest Stop to Rancho Tehama, where they visited her brother (Robert Duclos) and his girlfriend (Rochelle Hendricks). During direct examination by the prosecution, Robert Duclos said that he saw defendant going through a wallet while they were in Rancho Tehama. Defendant told Duclos "a guy pinched my sister in the butt and [defendant] beat him up for it and took his wallet." On cross-examination, Duclos testified that although he was not promised immunity, the prosecutor had shown him letters from the surrounding counties stating that the counties were not interested in prosecuting him.

The defense re-called Detective Troughton as a witness. On cross-examination, the prosecution asked Troughton to read from his report as to what Duclos had told him about defendant's explanation to Duclos as to the source of the credit cards. When the defense objected, the prosecution pointed out that the defense had questioned Detective Troughton about the accuracy of the report and the statement by Duclos to Troughton. Defense counsel responded that Duclos "had made different statements in his testimony." After the prosecution explained that its question to Detective Troughton sought to elicit a prior consistent statement by Duclos, the court overruled the defense objection. Troughton then read a statement by Duclos that, in referring to the victim, defendant said: "Don't worry about him, he's not a problem. I hurt him so bad that an ambulance came and took him away."

Defendant claims that the trial court's evidentiary ruling was wrong because the prosecution failed to show that Duclos made the statement at issue to Detective Troughton before making any inconsistent statement. As discussed above, a prior consistent statement is admissible as an exception to the hearsay rule if offered after an express or implied charge of bias or fabrication, and the prior consistent statement was made before the bias or motive for fabrication arose. (Evid. Code, §§ 791, 1236.) Here, the defense in its examination of Duclos asserted bias and a motive for fabrication by Duclos when it suggested that his testimony was influenced by promises from the counties surrounding Colusa County that they would not prosecute Duclos. Duclos's statement to Detective Troughton was consistent with his testimony at trial and was made before any promises not to prosecute him. Thus, the testimony was admissible as a prior consistent statement.

d. *Relevancy objection to Ron Woods's testimony*

Ron Woods testified about a March 19, 1993, gunfight at his apartment that occurred a few days after defendant's arrest. Defendant claims that the testimony identifying the participants in the gunfight was irrelevant and prejudicial.

The police arrested defendant and Ron Woods at the latter's apartment on Dawn Court in Sacramento. Woods, who was in custody when he testified, stated on direct examination by the prosecution that defendant and Doreen Westbrook brought the murder victim's credit cards and defendant's gun to Woods's apartment. Woods also testified that defendant told him he had shot someone and had taken the victim's credit cards. On cross-examination, the defense sought to impeach Woods by showing that he had received favorable treatment from the prosecution. The defense also elicited testimony by Woods that he was not charged with anything relating to the murder or arising out of his detention at his apartment, and defendant's arrest there, although drugs were found at his apartment and he had committed the offense of being a felon in possession of guns.

On redirect examination by the prosecution, Woods testified that two men, John Hancock and Richard Kiyoka, were involved in the shootout at his apartment during which time they shot at him and he shot at them; neither Hancock nor Kiyoka reported the incident to the police.

Defendant did not object to Woods's testimony identifying Hancock and Kiyoka as participants in the shootout. He thus has not preserved this issue for appeal. (Evid. Code, § 353.) In any event, admission of this testimony by Woods did not prejudice defendant. The testimony concerning the shootout and the identity of the participants was not linked to defendant in any way. It arose in the context of an attempt by the defense to impeach Woods by showing that Woods received favorable treatment from the prosecution in connection with the shooting incident that was not related to the murder charge against defendant.

## C. *Alleged Prosecutorial Misconduct*

Defendant raises numerous instances of alleged prosecutorial misconduct and asserts that these instances taken individually or collectively compel reversal of his murder conviction. We disagree.

 The law governing prosecutorial misconduct is well established. "Conduct by a prosecutor that does not violate a court ruling is misconduct only if it amounts to 'the use of deceptive or reprehensible methods to

attempt to persuade either the court or the jury' [citations] or 'is so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process' [citation]." (*People v. Silva* (2001) 25 Cal.4th 345, 373 [106 Cal.Rptr.2d 93, 21 P.3d 769]; accord, *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 120 [17 Cal.Rptr.3d 710, 96 P.3d 30].) A finding of misconduct does not require a determination that the prosecutor acted in bad faith or with wrongful intent. (*People v. Crew* (2003) 31 Cal.4th 822, 839 [3 Cal.Rptr.3d 733, 74 P.3d 820].) █ To preserve a claim of prosecutorial misconduct for appeal, a defendant must object and seek an admonition if an objection and admonition would have cured the harm. (*Ibid*; *People v. Hill* (1998) 17 Cal.4th 800, 820 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Applying these principles here, we review defendant's claims of prosecutorial misconduct in sequence.

1. *Claim that prosecution improperly elicited evidence of defendant's incarceration*

During the prosecution's direct examination of Doreen Westbrook, the following colloquy between the prosecutor and the witness occurred:

"[Q]: How long have you known [defendant]?

"[A]: About a year and a half or so.

"[Q]: Remember when you first met him?

"[A]: Yeah, at my house, somebody brought him to my house.

"[Q]: And did you use to hang out with [defendant]?

"[A]: Not—not really, cause he went back to prison right after I met him."

Defendant claims that the prosecutor's questioning constituted misconduct because the prosecutor knew that the questions were likely to elicit testimony about defendant's criminal history. Defendant, however, did not object at trial to this questioning. Therefore, the claim has been forfeited.

In any event, the claim lacks merit. As the Attorney General points out, the questioning occurred at the beginning of Westbrook's testimony and just before her testimony about the events leading up to defendant's killing of Glenn Chambers at the rest stop. It was simply an attempt by the prosecutor to establish the nature of the relationship between Westbrook and defendant. The question whether Westbrook used to "hang out" with defendant fit into that context. Westbrook's response that defendant "went back to prison right

after" she met him was not a response that the prosecutor could necessarily have anticipated. Defendant insists that the prosecutor must have anticipated Westbrook's answer because when the police asked her on the night she was apprehended how long she had known defendant, she replied she "met him a year and a half ago . . . then he went to the pen." Because the prosecution's question to Westbrook at trial that elicited her reference to defendant's prior incarceration was unlike the question the police asked her the night she was apprehended, the prosecutor had no reason to believe that his question at trial would cause Westbrook to mention defendant's imprisonment.

### 2. Alleged prosecutorial misconduct in introducing into evidence a photograph of defendant's tattoos

Defendant faults the prosecutor for introducing into evidence a photograph of defendant's torso showing tattoos depicting a swastika, the name of his gang on his chest, and a gun on his abdomen. The Colusa County Sheriff showed this photograph to Janet Madsen before she identified defendant from the videotape of his arrest, and it was a subject of her testimony regarding her identification of defendant. Because defendant did not object at trial, he has not preserved this issue for review. Also, contrary to defendant's claim, the photograph, which was actually introduced into evidence by the defense and not the prosecution, was relevant to Madsen's identification as it was the photograph shown to her at the time of her identification of defendant at the police station.

Equally without merit is defendant's assertion that the prosecutor committed misconduct by referring to defendant's gun tattoo in closing argument. In its cross-examination of defendant's friend John Hancock, the defense elicited a statement that Hancock had never seen defendant with a gun. Hancock's testimony gave rise to the inference that defendant did not use and was not around guns. Because the existence of a gun tattoo on someone's body gives rise to the inference that that person may be familiar with and be around guns, the evidence of the tattoo tended to impeach Hancock's testimony. It was thus a proper subject of the prosecutor's closing argument.

### 3. Claim that prosecution improperly elicited testimony of defendant's prior arrest

Defendant accuses the prosecution of engaging in misconduct by asking two witnesses, John Hancock and Dina McKee, about a prior arrest involving defendant and firearms.

The prosecution began the redirect examination of defendant's friend John Hancock by referring to Hancock's testimony on cross-examination by the

defense that he had never seen defendant carry a gun. The prosecution then elicited testimony from Hancock that he, defendant, and Dina McKee were arrested in June 1992 and that in a car search incident to that arrest the police seized two pistols. After asking Hancock if the guns belonged to him and being told they did not, the prosecutor remarked, "Supposedly they were Dina's?" Hancock responded that the police report stated that the guns were Dina's.

We reject defendant's contention that the prosecutor's questioning was designed to elicit inadmissible evidence of a propensity by defendant to have guns. Defendant failed to preserve this claim for appeal by not objecting to the questioning at trial. Moreover, the questioning was proper to impeach Hancock because Hancock's admission that he and defendant were arrested in a car in which guns were found raised doubts as to the veracity of Hancock's previous statement on cross-examination that he had never seen defendant carry a gun.

Nor, contrary to defendant's argument, does admission of that testimony violate the evidentiary limitations on the use of evidence of specific instances of prior misconduct. Those restrictions do not apply to evidence offered to support or attack the credibility of a witness. (Evid. Code, § 1101, subd. (c).) In addition, the record does not support defendant's assertion that Hancock's statement that he never saw defendant carry a gun was not admitted for its truth. The admission of the evidence was not so limited at trial. Finally, we see no impropriety in the prosecutor's apparently sarcastic remark, "Supposedly they were Dina's?," which implied that the prosecutor suspected that the guns found in the car actually belonged to either defendant or Hancock. Although the police report prepared at the time of the arrest stated that the persons in the car in which the guns were found claimed the guns belonged to Dina, the prosecutor was not required to accept this claim as truthful.

On direct examination by the defense, Dina McKee presented an alibi for defendant by saying that defendant spent the night with her when the murder occurred. On cross-examination, the prosecution asked about her June 1992 arrest, which occurred at the same time as the arrests of Hancock and defendant, and inquired whether the guns found in the car were hers. Defendant asserts that the prosecutor's questions constituted misconduct. We disagree. Evidence that defendant and McKee had previously been involved together in a criminal activity was relevant because it cast doubt on the credibility of McKee's testimony that defendant was spending the night with her when the murder occurred. (*People v. Freeman* (1994) 8 Cal.4th 450, 494 [34 Cal.Rptr.2d 558, 882 P.2d 249].)

### 4. *Alleged prosecutorial misconduct in eliciting testimony regarding defendant's gang affiliation and propensity for violence*

The prosecutor asked Doreen Westbrook to describe defendant's mood after he had used methamphetamine and they were driving from Sacramento to the rest stop where the murder occurred. Westbrook answered: "He was in a maniacin' mood, he was spun." She defined "spun" as "like you're rock and rollin' . . . don't care about nothing." She defined "maniacin' " as a state of mind that ends in violence with a person feeling "[t]en feet tall and bulletproof. You do—you do anything you want and you don't let nobody tell you no. You're above the law, you're above the rules, you break the rules, you do it just to see if you can get away with it." Westbrook also testified that she knew where the sound of the gunshot came from at the rest stop "[b]ecause [defendant] had a gun when we left Sacramento. We were joking around about robbing people, he was in a maniacin' mood, I knew where the shot came from."

Defendant accuses the prosecutor of misconduct by eliciting testimony from Westbrook that defendant was in a "maniacin' " mood the night of the murder. Defendant argues that the testimony was both improper opinion evidence of his propensity for violence and an irrelevant reference to his gang affiliation with the Sacramaniacs gang. Because defendant did not object to this testimony at trial, he is precluded from raising these issues on appeal. In any event, as explained below, defendant's arguments lack merit.

Contrary to defendant's argument, Westbrook's testimony was not objectionable as improper lay opinion evidence. The testimony defined Westbrook's use of the term "maniacin'," which needed explanation because it lacked a commonly understood meaning. Westbrook's opinion about defendant's state of mind on the night of the murder was admissible because it was based on her perceptions and helped to better understand her testimony. (Evid. Code, § 800, subd. (a); see also *People v. Williams* (1988) 44 Cal.3d 883, 914–915 [245 Cal.Rptr. 336, 751 P.2d 395].)

Nor was Westbrook's testimony irrelevant. It was relevant because it described defendant's state of mind at the time of the murder. In addition, contrary to defendant's assertion, the jury would not have understood Westbrook's statement defining the word "maniacin" as referring to defendant's affiliation with the gang called the Sacramaniacs. Her definition pertained to a state of mind, not a gang.

### 5. *Claims of prosecutorial misconduct relating to testimony concerning immunity*

Defendant accuses the prosecutor of misconduct in questioning Doreen Westbrook about her having been granted immunity. Defendant claims that

the questions misled the jury, unfairly bolstered Westbrook's credibility by suggesting "the trial court had given its imprimatur to the prosecution's decision to grant immunity," unfairly implicated defendant in the immunity process, and unfairly minimized the prosecution's role in granting Westbrook immunity. Because defendant did not object at trial to these questions, he has not preserved these claims for appeal. Moreover, as we will explain, the record does not support his allegations.

During direct examination, the prosecutor elicited from Westbrook the statement that the issue of immunity did not come up until she testified at the preliminary hearing, when, in the words of the prosecutor, defense counsel "*declared* the Fifth Amendment." (Italics added.) Defendant claims the word "declared" inaccurately implied that the defense asserted Westbrook's Fifth Amendment right. We disagree. As the Attorney General notes, defense counsel did raise the issue of Westbrook's privilege against self-incrimination at the preliminary hearing. Although the prosecutor would have been more precise had he said that defense counsel "raised the question of" Westbrook's Fifth Amendment privilege, instead of saying that counsel "declared" that privilege, the prosecutor's description of what transpired at the preliminary hearing was not inaccurate.

Likewise without merit is defendant's assertion that the prosecution unfairly bolstered Westbrook's credibility by suggesting that the court gave its imprimatur to the immunity. Westbrook responded "yes" to the prosecutor's question that the immunity "was granted by [the prosecutor's] office with the approval of the Court, correct?" There was no misconduct. The question merely informed the jury that Westbrook had received immunity. Here, as in *People v. Freeman, supra,* 8 Cal.4th at page 489, "[n]o reasonable juror would interpret the questions as implying that the judge, or anyone else, had vouched for her credibility."

### 6. *Claim that prosecutor improperly bolstered evidence of defendant's admissions*

Defendant and Doreen Westbrook were at the apartment on Dawn Court in Sacramento the morning of the murder with, among others, Kimberly Crawford. During Crawford's testimony on direct examination, the prosecutor asked her if defendant had made a statement along the lines of " 'I got these [credit] cards from an old guy who fought back so I shot him.' " Crawford responded that she was not sure defendant said anything about credit cards, but she did recall that defendant said he shot the man. The prosecutor then asked Crawford whether she remembered telling Detective Markss in a pretrial interview that defendant said he shot the man because the man put up a struggle. She answered "yes."

Defendant's claim of prosecutorial misconduct is based on the assertion that the prosecutor's reference to Crawford's prior out-of-court statement was improper hearsay because it included an inadmissible prior consistent statement by her. There was no objection at trial, so the claim is forfeited. Moreover, the reference was admissible to refresh Crawford's recollection. (*People v. Parks* (1971) 4 Cal.3d 955, 961 [95 Cal.Rptr. 193, 485 P.2d 257].)

### 7. Claim that prosecutor improperly coached Westbrook's testimony

At an in-chambers conference, defense counsel advised the trial court that his cross-examination of Doreen Westbrook would concern statements by her during a polygraph examination. Counsel proposed that Westbrook be given an opportunity to first review the tape of the polygraph examination outside the jury's presence. The prosecution then suggested that court and counsel proceed with the trial by having other witnesses testify.

Defendant contends that differences between Westbrook's testimony before she viewed the videotape of her polygraph examination and after she viewed it must have been the product of coaching by Detective Markss and thus prosecutorial misconduct. Nothing in the record supports defendant's statement that Detective Markss accompanied Westbrook to the room to view the videotape. In addition, the differences defendant cites in Westbrook's testimony before and after she viewed the videotape of her polygraph examination do not support his claim of prosecutorial misconduct. Before viewing the videotape, Westbrook testified it took her an hour and a half to drive from North Sacramento to Rancho Tehama; after viewing the videotape, she testified the drive took her two hours. Before viewing the videotape, Westbrook testified that defendant called her from jail and told her it would be "really wise" if she told the police that Billy Jinks committed the murder; after viewing the videotape, she testified that she was scared because defendant told her that doing what he asked would be "better for your health," a statement Westbrook understood to be a direct threat. The difference in Westbrook's testimony on the driving time is relatively minor, and her testimony about the telephone call from defendant is not in conflict. Finally, defendant forfeited the claim by failing to object at trial.

### 8. Claims of prosecutorial misconduct relating to testimony of John Hancock

Sacramento County Sheriff's Detective Richard Matranga interviewed John Hancock twice while Hancock was in custody. At trial, on direct examination by the prosecution, Hancock denied telling Detective Matranga that defendant had told him about shooting an old man and taking his wallet, and that

defendant had showed him a gun. On cross-examination by the defense, Hancock testified that he was defendant's best friend, that he would never give the police a statement about defendant's admitting anything, and that he would "do time" before he "would snitch somebody off." On redirect examination by the prosecution, Hancock denied telling Detective Matranga about his involvement in a shootout with someone named Kiyoka at the apartment of Ron Woods. He also denied telling Matranga about another shooting involving a man named "Loaf."

The prosecution next called Detective Matranga as a witness. Matranga testified that Hancock told him that he ran the Sacramaniac gang; that Hancock showed him two gang tattoos, one on his back and one on his penis; that Hancock told him that defendant bragged about the murder and showed Hancock a gun; and that Hancock provided details of the shootout at Woods's apartment involving Hancock, Woods, and a man named Kiyoka. Hancock also told Detective Matranga about a shooting involving a man named "Loaf."

Defendant argues it was misconduct for the prosecutor to elicit the testimony concerning Hancock's gang affiliation and gang tattoos. He contends the testimony was irrelevant. We disagree.

We recognize that evidence of gang affiliation creates a risk that the jury will infer a defendant's criminal disposition from the evidence and decide guilt of the offense charged based on that inference. As we have held previously, evidence of criminal disposition is inadmissible to prove commission of a specific act. (*People v. Williams* (1997) 16 Cal.4th 153, 193 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Gang affiliation evidence that is otherwise relevant, however, is admissible, although subject to trial court scrutiny because of its highly inflammatory impact. (*Ibid.*; *People v. Champion* (1995) 9 Cal.4th 879, 921–923 [39 Cal.Rptr.2d 547, 891 P.2d 93].) Here, evidence of Hancock's gang affiliation was relevant (Evid. Code, § 210), because the affiliation of Hancock and defendant with the same gang explained why defendant would have made incriminating statements about his involvement in the murder to Hancock.

Likewise misplaced is defendant's claim that the prosecutor on direct examination of Detective Matranga committed misconduct by eliciting testimony about Hancock's involvement in the shootout at Ron Woods's apartment and the shooting involving an individual nicknamed "Loaf." This testimony impeached the inconsistent statements Hancock made earlier while testifying on redirect examination by the prosecution.

### 9. *Claim of prosecutorial misconduct in eliciting evidence of incarceration of defense witness's husband*

Defendant accuses the prosecutor of misconduct by eliciting from John Hancock testimony agreeing with the prosecutor's comment about defense witness Dina McKee's husband being "in the joint now." In sustaining a defense objection, the trial court said: "I don't know any relevance for it." The court admonished the prosecution not to "go into it." The misconduct, if any, was not prejudicial to defendant, because any possible harm was cured by the trial court's admonition.

### 10. *Claim of prosecutorial misconduct for asking leading questions*

According to defendant, the prosecutor committed misconduct when he asked leading questions at the guilt phase of the trial. Defendant, however, fails to identify the questions, instead providing only record citations, a quotation where the trial court told the prosecutor to "be careful," and a quotation where the prosecution asked the court for "a little latitude with this witness" and the court responded, "I haven't seen any problem yet."

The record does not support defendant's allegation of prosecutorial misconduct. The parts of the record cited by defendant in support of his claim of prosecutorial misconduct show nothing more than the normal process of questioning and objections at trial. For example, defendant cites the following exchange as indicative of prosecutorial misconduct.

"[Prosecutor] Did you—you knew that what you were doing at that point in time was against the law, did you not?

"[Defense Counsel] Leading. Form of the question is leading.

"[Court] Sustained.

"[Prosecutor] Did you know whether or not using stolen credit cards is against the law?

"[Witness] Yes."

We have reviewed defendant's citations to the record in support of his allegation and conclude that they do not establish prosecutorial misconduct because they do not show deceptive or reprehensible methods by the prosecution. Nor do they show that the trial was infected with unfairness resulting in

a conviction that denied defendant due process. (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 120.)

### 11. *Alleged prosecutorial misconduct at closing argument*

Defendant cites as misconduct a number of statements the prosecutor made during closing argument to the jury. Defendant, however, did not object to any of the challenged statements and therefore cannot now raise them. (*People v. Crew, supra,* 31 Cal.4th at p. 839.)

In any event, we conclude that the statements either were not misconduct or did not prejudice defendant. During closing argument to the jury, the prosecutor stated that Manuel Acosta, the truck driver at the rest stop where the murder occurred, testified that defendant did not look like the man he saw come out of the restroom and commented, " 'Well, I guess I missed the beard.' " The statement about missing the beard, however, was made not by Acosta but by Janet Madsen, who testified that she saw defendant come out of the restroom right after the shooting. The jurors could not have been misled, because in her testimony eyewitness Madsen readily acknowledged "miss[ing] the beard." This, coupled with defense counsel's closing argument to the jury that Acosta had testified that defendant was not the man he saw at the scene of the murder, supports our conclusion that defendant has not shown a reasonable likelihood that the jury was misled by the prosecutor's attributing to Acosta the statement about defendant's beard. (*People v. Brown* (2003) 31 Cal.4th 518, 553 [3 Cal.Rptr.3d 145, 73 P.3d 1137].)

Defendant complains about the prosecutor's description of defense counsel Leo Steidlmayer as a "highly paid professional." In his closing argument to the jury, defense counsel said that he was in the position of acting as a 13th juror. The prosecutor responded he had difficulty with that description because defense counsel, unlike the jurors, is "as much of a—of a highly trained and skilled lawyer as anybody who is sitting at counsel table here." A prosecutor's description of defense counsel as being a highly trained and skilled lawyer is not misconduct. Such a statement does not rise to the level of a deceptive or reprehensible attempt to improperly influence a jury. (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 120; *People v. Silva, supra,* 25 Cal.4th at p. 373.)

Defendant asserts that the prosecutor improperly "vouched for his case" by telling the jury that defense counsel's "idea of blowin' smoke and roiling up the waters to try to confuse you is you put everybody else on trial." It is not misconduct for a prosecutor to argue that the defense is attempting to confuse the jury. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302, fn. 47 [18

Cal.Rptr.2d 796, 850 P.2d 1].) Here, the record does not support defendant's characterization of the prosecution's statement as attacking the integrity of defense counsel.

We now turn to defendant's allegation that the prosecutor committed misconduct by misstating defense counsel's argument and the evidence. During closing argument to the jury, the prosecutor stated that defense counsel attributed eyewitness Madsen's statement, "That man is the man I saw," to the morning after the murder when Madsen assisted Siskiyou County Sheriff's Sergeant Gary Perry with the composite drawing. The prosecutor asserted there was no evidence to support defense counsel's argument. Defense counsel's argument, however, referred to Madsen's in-court identification, not to her statement at the time of the composite drawing. Thus, the prosecutor confused defense counsel's statement pertaining to Madsen's in-court testimony with Madsen's testimony about the composite drawing. The misconduct, if any, was not prejudicial to defendant, however, because it is not reasonably likely that the jury misunderstood or misapplied the comment. It was clear that Madsen's in-court identification was the subject of defense counsel's argument. Contrary to defendant's assertion, the prosecutor's misstatement would not have led the jury to impute any impropriety to defense counsel.

Defendant also accuses the prosecutor of misconduct in stating in closing argument to the jury that Ron Woods was not charged with any crimes arising out of the shootout at his apartment because of the lack of cooperation from victims Hancock and Kiyoka. There was no misconduct, for the prosecutor's comment correctly reflected the evidence produced at trial: No charges were filed against Woods because the victims did not report the shooting to the police.

Nor was there misconduct when the prosecutor pointed out to the jury that after the defense said in its opening statement that it would call Jay Blaylock as a witness, it did not do so. Blaylock, who was with Janet Madsen at the public rest stop at the time of the murder, did not testify at trial. It is not misconduct for a prosecutor to comment on the failure of the defense to introduce material evidence or to call witnesses. (*People v. Mincey* (1992) 2 Cal.4th 408, 446 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

Defendant contends the cumulative effect of the alleged instances of prosecutorial misconduct, which we discussed above, compels reversal of the judgment. We disagree. Any impropriety by the prosecutor, whether considered individually or together, did not rise to the level of misconduct that would require reversal of the judgment.

### D. *Cumulative Prejudice of Errors at Guilt Phase of Trial*

Defendant argues that the cumulative prejudice of the errors he alleges occurred at the guilt phase of the trial compel reversal of the judgment. But, as discussed above, any errors that occurred were of an insubstantial nature. Whether viewed either alone or in combination, the errors did not prejudice defendant.

### III. PENALTY PHASE

### A. *Limiting Defense Closing Argument*

Defendant contends the trial court violated section 1095, to his prejudice, when it conditioned his right to have second counsel argue at the penalty phase on the prosecution's option to present a second closing argument to the jury. The record does not support defendant's assertion.

Section 1095 provides that in a capital case "two counsel on each side may argue the cause." The right of each side to present arguments by two attorneys exists regardless of whether the opposing side presents arguments by two attorneys. (*People v. Bonin* (1988) 46 Cal.3d 659, 694, fn. 3 [250 Cal.Rptr. 687, 758 P.2d 1217].) Violation of this rule does "not amount to a denial of [a] constitutional right." (*Id.* at p. 694.)

In discussing the matter of closing argument, the trial court stated: "So then number of argument, just a couple of details. You're entitled to two. Are we gonna have two each, are we gonna have one each?" The prosecution responded that it would do one closing argument, but depending on the closing argument by the defense it would either "waive" or present a second closing argument. Defense counsel then said, "if they waive that that would cut off our right to a second argument." When defense counsel asked the prosecutor to make the decision before the conclusion of the first argument by the defense, the prosecutor said it was impossible to do so. The court then told defense counsel: "He wants to hear your argument before he decides whether to give up or not." The court made no further comments. The prosecution then made its closing argument, followed by closing argument by the defense. At the conclusion of the defense argument, the prosecution said it saw no need for further argument. Defense counsel responded: "Matter submitted, your honor."

The above recitation of what occurred at trial refutes defendant's claim that the court precluded the defense from exercising the statutory right to have "two counsel . . . argue the case."

### B. *Alleged Prosecutorial Misconduct*

Defendant accuses the prosecution of various acts of misconduct at the penalty phase.

Earlier, with respect to the alleged prosecutorial misconduct at the guilt phase, we set forth the governing law. In brief, prosecutorial misconduct occurs only if the actions by the prosecution involve " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury' [citations] or 'is so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process' [citation]." (*People v. Silva, supra,* 25 Cal.4th at p. 373.) To preserve a claim of prosecutorial misconduct for appeal, a defendant must object and seek an admonition if doing so would have cured the harm. (*Ibid.*; *People v. Hill, supra,* 17 Cal.4th at p. 820.)

Defendant has forfeited each claim of prosecutorial misconduct at the penalty phase because of his failure to object at trial. (*People v. Silva, supra,* 25 Cal.4th at p. 373; see *People v. Miller* (1990) 50 Cal.3d 954, 1000–1001 [269 Cal.Rptr. 492, 790 P.2d 1289].) Defendant insists that his failure to preserve his claims for appeal should be excused on the ground that the misconduct rendered the penalty verdict so unfair and unreliable as to require reversal of the penalty verdict. The record does not support defendant's argument, as discussed below.

#### 1. *Alleged interference with witness preparation*

Defense counsel obtained court orders directing that defendant's two brothers, Hank and Buford Kennedy, be transferred from the facilities in which they were then incarcerated to the Colusa County Jail so they could testify on November 17, 1993, at 9:00 a.m., as defense witnesses at the penalty phase of defendant's trial. At 8:55 a.m. on that date, defense counsel advised the court in chambers that he was informed the night before that the two brothers were not available and that the jail staff was unable to tell counsel where the witnesses were. When defense counsel indicated his desire to speak to the two brothers before they testified, the court assured counsel, "You'll have that right, no question." The prosecutor then mentioned that the two brothers were not going to be housed at the Colusa County Jail because of security concerns. Defense counsel responded that he had not expected that he "wouldn't be able to even see them until after the trial started." The court assured defense counsel he would "have the time."

The parties then addressed the admissibility of a videotape and certain concerns by defendant that some defense witnesses might assert their constitutional rights to not incriminate themselves. When the discussion returned to

the availability of defendant's two brothers as witnesses, the prosecutor said that he would make a telephone call at the next break to find out when defendant's two incarcerated brothers would arrive at the Colusa County Jail, and make arrangements for them to meet with defense counsel. The court told defense counsel to let the court know if there were any problems, adding that the court would "make sure you see 'em at a reasonable time and place."

The prosecutor later informed the trial court that defendant's two incarcerated brothers would be arriving at the Colusa County Jail later that morning, one at 10:30 and the other at 11:30, and that defense counsel would be given ample time to interview them. When the court told defense counsel "rest assured that this Court will see that the proceedings afford you ample opportunity to interview those two witnesses," defense counsel said that the "issues raised this morning then are all resolved as far as we're concerned." The parties and the court then proceeded to deal with the admissibility of a videotape and a matter concerning a juror.

After the prosecution completed its opening statement to the jury, defense counsel informed the court, "because of the issues we raised this morning we prefer to reserve our right to make an opening statement at the opening of our case." After the prosecution presented its penalty phase witnesses, the prosecutor told the court and defense counsel that defendant's two brothers had arrived at the jail. At defense counsel's request, the court extended the noon recess to 1:30 p.m.

At 1:25 p.m. the court and counsel met again in chambers. Defense counsel mentioned he had been unable to interview defendant's two brothers at the jail because Department of Corrections staff told him that he could not meet with defendant and the latter's two brothers at the same time and that any conversations would have to be conducted over the jail phones, which were monitored. Arrangements were then made for the three Kennedy brothers to be in adjoining cells; defense counsel would be outside the cells in the presence of an officer who was not to communicate with the prosecution. The court then ordered a recess and asked the jurors to return at 3:00 p.m.

When the court reconvened at 3:00 p.m., the prosecution rested and a discussion ensued at a sidebar conference whether Buford Kennedy, defendant's incarcerated brother, would testify wearing prison clothes and in shackles. The prosecutor mentioned the safety concerns expressed by a Department of Corrections officer, described Buford as "damn near 5150" (a reference to a person being dangerous or gravely disabled within the meaning of Welfare and Institutions Code section 5150), and said that "his appearance wouldn't even look good in a three-piece suit" because of "ink all over his face, tattoo all over his face . . . ." Defense counsel suggested that Buford

Kennedy testify in prison clothes with handcuffs, but that Hank Kennedy testify in prison clothes without physical restraints. The defense then called Buford Kennedy as a witness.

Based on the events described above, defendant contends that "court error here combined with prosecutorial misconduct" to deprive him of his right to access to witnesses and to present a defense. Not so.

Contrary to defendant's assertion, the circumstances surrounding his trial counsel's access to defendant's incarcerated brothers, Buford and Hank Kennedy, did not compel counsel to waive his opening statement at the beginning of the proceeding. As mentioned earlier, defense counsel expressed a preference to defer an opening statement to "the opening of our case." This, counsel said, was prompted by the "issues we raised this morning," a reference to issues relating to the possible exercise of the privilege against self-incrimination by potential defense witnesses John Hancock and Richard Kiyoka. Although defense counsel initially expressed concern about the adequacy of access to the two jailed brothers, that issue was later resolved by the trial court, and defense counsel so stated in court, as we mentioned earlier.

We also reject defendant's claim that the prosecutor committed misconduct by denying defense counsel sufficient time to address concerns relating to defense witness Buford Kennedy's mental issues. The record discloses that defense counsel had an opportunity to meet with Buford and Hank Kennedy during the court recess from 1:45 p.m. to 3:00 p.m., that defense counsel did not express a need to postpone Buford's testimony, and that Buford's testimony was coherent and lucid. Nor is there any merit to the claim that defendant's rights were violated because he was not allowed to speak to his two brothers either personally or through his attorney privately. The arrangements made and agreed to by the parties did not preclude defendant from speaking "privately" to either of defendant's brothers.

2. *Allegation that prosecution made a defense witness unavailable*

In the afternoon of November 16, 1993, the day before the beginning of the penalty phase of defendant's capital trial, defense counsel learned that several individuals had been arrested for the attempted murder of John Tucker, also known as "Loaf." The persons arrested included John Hancock, who had testified during the guilt phase of defendant's trial. Hancock's attorney later told defense counsel that Hancock would not testify at the penalty phase because he would assert his privilege against self-incrimination. Noting that the "Loaf" shooting had occurred eight months before the arrests of persons involved in that shooting, and that the arrests

were made shortly before defendant's penalty phase trial was to begin, defense counsel accused the prosecution of having Hancock arrested to prevent him from testifying for defendant at the penalty phase of defendant's capital trial. Defense counsel also moved to exclude evidence relating to the shooting of Loaf. The prosecution responded by noting that it had given timely notice of its intent to use the Loaf shooting as evidence of an aggravating factor at the penalty phase, that the defense motion was not supported by legal authorities, and that a witness's right to invoke the privilege against self-incrimination did not depend on whether the witness had been arrested.

After further argument to the trial court, the defense moved to exclude evidence of the "Loaf shooting" or in the alternative for a continuance of the trial to enable the defense to adequately prepare to address such evidence and the issues raised by the possible assertion by John Hancock of the privilege against self-incrimination. When the trial court announced it would grant the defense motion for a continuance if the prosecution intended to proceed with evidence of the "Loaf shooting," the prosecution replied it would not introduce the evidence in its case-in-chief.

■ Defendant accuses the prosecutor of misconduct by preventing potential defense witness John Hancock from testifying by having him arrested for the shooting of Loaf, which in turn led to Hancock's expected invocation of the privilege against self-incrimination. To establish a violation of the constitutional right to the compulsory process of witnesses, the defendant must show, among other things, " 'activity that was wholly unnecessary to the proper performance of [the prosecution's] duties and was of such a character as "to transform [a defense witness] from a willing witness to one who would refuse to testify," ' and . . . interference with the fact-finding process—that is, 'a causal link between the misconduct and [the defendant's] inability to present witnesses on his own behalf.' " (*People v. Stewart* (2004) 33 Cal.4th 425, 471 [15 Cal.Rptr.3d 656, 93 P.3d 271].) The defendant must also show that the witness's testimony would have been both material and favorable. (*Ibid.*; *In re Martin* (1987) 44 Cal.3d 1, 31–32 [241 Cal.Rptr. 263, 744 P.2d 374].) There is no need here to evaluate each of these requirements, as defendant has failed to show that the testimony of potential witness Hancock would have been both material and favorable. The required showing is not made by defendant's unsupported assertion that Hancock "was slated to present evidence in mitigation of punishment, testimony obviously material and favorable to the defense." It was the prosecution that identified Hancock as a witness it intended to call to present evidence in aggravation at the penalty phase. And Hancock's testimony at the guilt phase, which was impeached, undermines defendant's assertion that Hancock's testimony during the penalty phase would have been material and favorable to the defense.

### 3. *Alleged prosecutorial misconduct in implicating defendant in a second murder*

Defendant accuses the prosecution of misconduct by asking questions during cross-examination of defendant's two brothers, Buford Kennedy and Hank Kennedy, that taken together suggested defendant's involvement in a second murder. We disagree.

On cross-examination, Buford Kennedy told the prosecutor he did not want defendant executed. The prosecutor then asked, "Whether it was one murder or even if it was two murders?" Buford responded by saying "if it was two murders or one murder, if he was guilty I feel that he would have copped to it." Later, during the prosecutor's cross-examination of Hank Kennedy, when Hank said he did not know what defendant did when he was released from prison on March 5, 1993, the prosecutor asked him if he knew "what [defendant] did on March 9, 1993?" Hank answered "no." The prosecution then asked to approach the bench and, in defense counsel's presence, said: "My position is that given on direct testimony and especially the part about where he thinks his brother can lead a productive life, that it's proper to impeach this witness with the evidence of the Loaf shooting." The court refused to allow the prosecutor to use evidence of the Loaf shooting. Because of the trial court's rulings excluding evidence concerning what was referred to at trial as the "Loaf shooting," the record discloses very little about the matter. Presumably, the references to the "Loaf shooting" are to the attempted murder of John Tucker, also known as "Loaf," that we discussed in the previous part.

Defendant's allegation that the prosecution committed misconduct because the jury could infer from the cross-examinations of defendant's brothers, Buford and Hank Kennedy, that defendant committed a second murder is too speculative. The prosecutor's question to Buford Kennedy about a second murder, quoted in the immediately preceding paragraph, was not connected to any facts about any murder. The prosecutor's question to Hank Kennedy, also quoted above, stated a date, March 9, 1993, presumably the date of the "Loaf shooting" incident, but the question asked only about a date; it was not connected to anything about the Loaf shooting or any other factual assertions. We conclude that the jury would not have inferred from these questions that defendant had committed a second murder.

### 4. *Claim of improper cross-examination by prosecutor*

Defense witness Hank Kennedy testified on direct examination that defendant should not be sentenced to death because he could lead a productive life in prison. On cross-examination, the prosecutor asked Hank a number of

questions concerning defendant's criminal background. Hank was asked if it was a "pretty accurate guess" to say that defendant had been out of jail or prison for only six months in 11 years. Hank responded, "Probably." When he was asked about defendant's listing his occupation on California Department of Correction records as being a robber, Hank replied, "I'm not gonna deny he's ever robbed anyone." Hank responded to a prosecution question about defendant's telling him of "using a sawed-off shotgun on a lady and a kid to do a robbery" by saying defendant told him "about that but not on a woman and a child, no." Later during the cross-examination, the prosecution asked Hank if defendant's job in 1976 as an electrician ended because defendant went to federal prison for stealing cars and taking them across state lines. Hank answered, "I'm not sure what he was in federal prison for but I believe so." When asked by the prosecution if defendant and Hank had been arrested in a "guns and dope case," Hank replied that the case was dismissed.

 Defendant argues that the prosecutor engaged in misconduct by asking questions on cross-examination involving prior bad acts by defendant. We disagree. Evidence of specific instances of conduct is admissible to attack the credibility of a witness. (Evid. Code, § 1101, subd. (c).) Thus, the prosecution may cross-examine a defense character witness about acts inconsistent with the witness's testimony as long as the prosecution has a good faith belief that such acts actually occurred. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1170 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

### 5. *Allegation that the prosecution improperly implied the existence of facts that could not be proved*

In cross-examining defense witness Hank Kennedy, the prosecutor asked about his numerous prior felony convictions. Hank explained that he was not convicted of attempted murder but of shooting at an occupied vehicle and that one of the convictions was not for grand theft from a person but for stealing a backhoe trailer. The prosecutor also cross-examined defense witness Buford Kennedy about his numerous prior felony convictions. He denied having been convicted of assaulting a police officer, claiming the conviction was for assault with a deadly weapon and did not involve a police officer. On cross-examination of defendant, the prosecutor, referring to the evidence about a shootout at Ron Woods's apartment involving John Hancock and someone named Richard Kiyoka, asked defendant: "Did you tell [John Hancock] and Richard Kiyoka to go shoot up Ron Woods so he wouldn't testify against you?" Defendant responded, "No sir, I did not."

Defendant contends the prosecutor committed misconduct because these questions imply the existence of facts the prosecutor could not prove. There were no defense objections to the prosecution's questions and thus no further

inquiry into or development of the subject matters of the prosecution's questions. Accordingly, there is nothing in the record to support defendant's assertion that the prosecution could not prove the facts implied in the questions or that the prosecutor asked the questions in bad faith. (*People v. Barnett, supra,* 17 Cal.4th 1044, 1170–1171.)

### 6. *Alleged prosecutorial impropriety in asking objectionable questions*

Defendant quotes at length from the prosecution's cross-examination of Buford Kennedy inquiring into defendant's criminal record, in the course of which the trial court sustained a defense objection to one of the questions as argumentative. Defendant then quotes the following question by the prosecutor asking Sharon Galiano about a residential robbery committed by defendant, to which the trial court sustained a defense objection on the ground the question was leading and suggestive: "Did the defendant . . . make a statement to you while he was in the house that he wanted to kill your husband?" Finally, defendant simply gives two reporter's transcript citations with the notation that argumentative objections were there sustained, without further elaboration.

Defendant presents no argument and makes no effort to establish that his quoted portion of the prosecution's cross-examination of Buford Kennedy, his quoted question from the prosecution's direct examination of Sharon Galiano, or his two citations to the reporter's transcript, individually or collectively, support his allegation of prosecutorial misconduct. Having reviewed the challenged testimony, we conclude that they do not.

### 7. *Alleged prosecutorial misconduct during closing argument*

During his closing argument at the penalty phase, the prosecutor told the jury that it should be insulted by defendant's attitude and demeanor, and by his comment to the jury that it was wrong in convicting him of the murder. The prosecutor told the jury it could consider this conduct by defendant as an aggravating factor. Thereafter, in his closing argument, defense counsel described the prosecutor's argument as a "smoke screen" and pointed out to the jury that an innocent person must maintain his or her claim of innocence.

Defendant contends that the prosecutor committed misconduct by telling the jury that defendant's continued claim of innocence during the penalty phase could be considered as an aggravating factor in determining the penalty.

We agree with defendant that it was improper for the prosecutor to state that defendant's testimony at the penalty phase that he was innocent was an

aggravating factor. (*People v. Fierro* (1991) 1 Cal.4th 173, 244 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) Defendant failed to preserve this issue for appeal, however, because he did not object and request an admonition at trial. In addition, the comment was not prejudicial, because it was brief and was directly addressed and countered by defense counsel in his closing argument.

 We reject defendant's additional claim that the prosecution committed misconduct during its closing argument in telling the jury that defendant deserved no less punishment than what he inflicted on the murder victim and that defendant did not show mercy or sympathy to the victim. The argument is permissible under California law. (*People v. Ochoa, supra,* 19 Cal.4th at pp. 464–465.)

> 8. *Cumulative prejudice of alleged prosecutorial misconduct at the penalty phase*

Earlier, we identified one error at the penalty phase: the prosecutor's statement during his closing argument to the jury that it could consider as an aggravating factor defendant's continuing assertion of innocence during the penalty phase after the jury at the guilt phase had convicted him of the murder. But, as we explained earlier, this error was not prejudicial to defendant.

## C. *Failure to Instruct on Criminal Activity Involving Force*

 Defendant contends the trial court committed prejudicial error in not instructing the jury that it could not consider evidence that defendant had committed crimes other than those with which he was charged unless the jury found the other crimes were proved beyond a reasonable doubt. Our law does require the jury to be so instructed. (*People v. Avena* (1996) 13 Cal.4th 394, 429 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; *People v. Robertson* (1982) 33 Cal.3d 21, 53–54 [188 Cal.Rptr. 77, 655 P.2d 279]; see CALJIC No. 8.87.) The failure to do so is prejudicial if it is reasonably possible the failure to instruct affected the jury's verdict. (*People v. Avena, supra,* at p. 429.) The Attorney General argues that the failure to so instruct the jury here was not prejudicial. We agree.

The evidence against defendant at the penalty phase consisted primarily of victim impact testimony, evidence of his conduct underlying his 1986 conviction for the residential robbery of Sharon Galiano and her four-year-old daughter, and evidence of his other convictions before the verdict of guilt of the offenses charged in this case. Defendant's assignment of error here concerns the trial court's failure to instruct as to the evidence of his conduct during the 1986 robbery.

The prosecutor's closing argument made two related references to criminal activity involving the use of force or violence or the implied threat to use force or violence involving the 1986 robbery. (§ 190.3, factor (b).) He first commented that the jury could consider the residential robbery of Sharon Galiano and her four-year-old daughter and then commented on a letter defendant wrote while incarcerated at the Sacramento County jail "asking somebody to take care of Sharon Galiano," a letter the prosecutor described as threatening Galiano.

The records of defendant's convictions for the 1986 robbery of Galiano and possession of a sawed-off shotgun relating to that robbery were before the jury, the trial court instructed the jury that it could not consider those prior convictions unless it found beyond a reasonable doubt that defendant was the person convicted of those crimes, and defendant admitted committing and being convicted of the robbery. Although defendant denied pointing the shotgun at Galiano's four-year-old daughter, he testified that he may have accidentally pointed the gun at Galiano and that he pointed the gun "at people when [he] walked through the door" of Galiano's house. Defendant also admitted to writing a letter while in the Sacramento County jail "asking somebody to take care of Sharon Galiano." Defendant testified that by "tak[ing] care of Sharon Galiano" he meant to try to bribe her not to testify against him, not to kill her.

It is not reasonably possible in light of the above described evidence that the trial court's failure to instruct the jury that it could not consider evidence of prior crimes unless the jury found the other crimes proved beyond a reasonable doubt affected the jury's verdict. With the exception of disputing that he pointed the gun at Galiano's four-year-old daughter during the 1986 residential robbery, defendant admitted the facts underlying the robbery and the robbery conviction. Even as to the pointing of the gun during the robbery, defendant admitted that he pointed it "at people" when he came through the door of Sharon Galiano's residence. The only people there were Galiano and her four-year-old daughter. The only evidence before the jury concerning the letter defendant wrote from jail "asking somebody to take care of Sharon Galiano" was defendant's own testimony that he meant to have someone bribe, not kill, Galiano. In view of the substantial aggravating evidence presented, the evidence of defendant's letter about Galiano is not such that it would have played any significant role in the jury's decision.

■ Moreover, defendant was not entitled to the reasonable doubt instruction for other crimes of which he had been convicted. The instruction applies only to *unadjudicated* violent criminal activity. (*People v. Welch* (1999) 20 Cal.4th 701, 766 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Here, the other crimes evidence consisted primarily of defendant's *adjudicated* conduct, that is, the conduct that had resulted in his prior convictions for robbery

and illegal weapon possession. The evidence of defendant's other criminal activity not resulting in convictions, such as the letter about Galiano, was relatively insignificant, so that it is not reasonably possible the trial court's failure to instruct on the reasonable doubt standard as to those other crimes affected the jury's verdict.

Our conclusion that defendant was not prejudiced by the trial court's failure to instruct on crimes other than those charged in this case is not changed by defendant's assertion, without supporting record citations or elaboration, that the prosecutor insinuated throughout the case that defendant committed other threatening or violent criminal conduct. Specifically, defendant claims the prosecutor referred to: defendant's unlawful possession of firearms; threats to Doreen Westbrook; prison assaults; unspecified criminal activity "perhaps" involving an attempted murder on March 9, 1993 (presumably the "Loaf shooting"); and a threat to kill Sharon Galiano's husband. All of this conduct was either admitted by defendant, was established by records of defendant's convictions, primarily concerned individuals other than defendant, or was at most a passing reference by the prosecutor.

D. *Automatic Motion to Modify Penalty Verdict*

The trial court denied defendant's automatic motion to modify the jury's verdict of death. (§ 190.4, subd. (e).) In denying the motion, the court stated that it was guided by the statutory aggravating and mitigating factors, and it made a number of findings. In the course of discussing its findings of aggravating factors, the court said: "At this point, [defendant] has shown no remorse for his conduct, in fact denies perpetrating the crime."

Defendant contends the trial court erred in using defendant's lack of remorse as an aggravating factor. Defendant, who had instructed counsel to submit the motion at issue without argument, did not object at trial and, accordingly, failed to preserve the issue for appeal. (*People v. Martinez* (2003) 31 Cal.4th 673, 701 [3 Cal.Rptr.3d 648, 74 P.3d 748]; *People v. Riel, supra,* 22 Cal.4th at p. 1220.) In any event, the error did not prejudice defendant.

We agree with defendant that lack of remorse cannot be used as an aggravating factor unless it is a circumstance of the murder. (*People v. Crew, supra,* 31 Cal.4th at p. 857; *People v. Mendoza* (2000) 24 Cal.4th 130, 187 [99 Cal.Rptr.2d 485, 6 P.3d 150].) But we conclude that there is no reasonable possibility (*People v. Avena, supra,* 13 Cal.4th at p. 448) the error affected the trial court's decision, as discussed below.

In discussing aggravating factors, the trial court found that the killing of Glenn Chambers was during a robbery, was intentional, had been planned,

and was committed 10 days after defendant had been paroled. The court also noted defendant's prior convictions for robbery and weapons charges, and it mentioned that defendant had been in prison for 10 out of the past 11 years. As to mitigating factors, the court stated after considering every possible mitigating factor, including any circumstances extenuating the gravity of the crime, it found "nothing except the possibility that there was testimony that Mr. Kennedy used some narcotics prior to the commission of this offense, this killing." With respect to defendant's use of drugs, the court commented that the "particular evidence [of defendant's drug use at the time of the crime] is un—unmoving to this Court and is unconclusive [*sic*] as the evidence stands at this time." In short, the court identified a number of aggravating factors but found only one possible mitigating factor, which the court described as "unmoving" and "inconclusive." Under these circumstances, the trial court's error in viewing defendant's lack of remorse as an aggravating factor did not prejudice defendant.

### E. *Alleged Violations of International Law*

Defendant contends the violations of state and federal law he has asserted on this appeal also establish that he was denied the right to a fair and impartial trial in violation of international law. We reject this contention. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1055 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; see *People v. Smith* (2005) 35 Cal.4th 334, 374 [25 Cal.Rptr.3d 554, 107 P.3d 229]; *People v. Brown* (2004) 33 Cal.4th 382, 403–404 [15 Cal.Rptr.3d 624, 93 P.3d 244].)

### F. *Cumulative Error*

Defendant contends the judgment must be reversed because of the cumulative prejudice of errors at the guilt and penalty phases of his capital trial. Considered individually or collectively, the very few errors at defendant's trial were not prejudicial.

### IV. CHALLENGES TO DEATH PENALTY LAW

Defendant challenges the constitutional validity of California's death penalty law on a number of different grounds. We reject each challenge.

### A. *Failure to Sufficiently Narrow Eligibility for Death Penalty*

Defendant contends California's death penalty law violates the Eighth Amendment to the federal Constitution's prohibition against cruel and unusual punishment because it does not meaningfully distinguish the cases in which the death penalty is imposed from the cases in which it is not. He

asserts that the death penalty law contains so many special circumstances making a defendant eligible for the death penalty that it no longer performs the constitutionally required narrowing function. We have in the past repeatedly rejected this challenge. (E.g., *People v. Crew, supra,* 31 Cal.4th at pp. 859–860; *People v. Bolden* (2002) 29 Cal.4th 515, 566 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

We also reject defendant's assertion that the Eighth Amendment to the federal Constitution prohibits the death penalty as a form of punishment because the death penalty is not recognized in European countries and therefore is cruel and unusual. Whether a form of punishment is cruel and unusual under the Eighth Amendment is determined based on an evaluation of evolving standards of decency. (*Trop v. Dulles* (1958) 356 U.S. 86, 100–101 [2 L.Ed.2d 630, 78 S.Ct. 590].) Although the practices and norms of other nations can be relevant in determining whether a punishment is cruel and unusual under the Eighth Amendment, they are not controlling. (*Roper v. Simmons* (2005) 543 U.S. 551, 578 [161 L.Ed.2d 1, 125 S.Ct. 1183, 1200].) What matters are the standards of decency of the American people. As our high court has stated, "the 'clearest and most reliable objective evidence of contemporary values is the legislation enacted by' " our nation's legislatures. (*Atkins v. Virginia* (2002) 536 U.S. 304, 312 [153 L.Ed.2d 335, 122 S.Ct. 2242].)

Defendant further contends that our death penalty law violates the equal protection clause and the Eighth Amendment to the federal Constitution because it allows the imposition of the death penalty based on the felony-murder rule, which does not require intent to kill, while a premeditated and deliberate intentional murder does not necessarily qualify the murderer for the death penalty. We have previously rejected this contention. (*People v. Taylor* (1990) 52 Cal.3d 719, 747–748 [276 Cal.Rptr. 391, 801 P.2d 1142]; *People v. Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306].)

B. *Triple-counting Same Facts*

Defendant contends that the use of the same fact—robbery of the murder victim—(1) to qualify the murder as first degree murder, (2) to make the murder eligible for the death penalty, and (3) as an aggravating factor in deciding whether the death penalty should be imposed, was impermissible. He argues that multiple use of the same facts violates the Eighth Amendment, the Fourteenth Amendment, and the Fifth Amendment to the United States Constitution. We have in the past rejected this argument (*People v. Webster* (1991) 54 Cal.3d 411, 455–456 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People v. Marshall* (1990) 50 Cal.3d 907, 945–946 [269 Cal.Rptr. 269, 790 P.2d 676]) and do so again here.

## C. *Challenges to the Penalty Phase of Trial*

Defendant presents a number of challenges to the penalty phase of the trial. As he acknowledges, this court has in prior decisions rejected these challenges. We briefly discuss these holdings below.

■ A trial court is not required on its own motion to instruct the jury not to consider the same facts as circumstances of the offense and as special circumstances. (*People v. Cain* (1995) 10 Cal.4th 1, 68 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

■ Allowing the jury to consider the circumstances of the crime (§ 190.3, factor (a)) does not lead to the imposition of the death penalty in an arbitrary or capricious manner. (*People v. Brown, supra,* 33 Cal.4th at p. 401.)

■ The trial court is not required to delete any inapplicable factors from the list of statutory factors presented to the jury. (*People v. Jones* (2003) 30 Cal.4th 1084, 1128–1129 [135 Cal.Rptr.2d 370, 70 P.3d 359].)

■ Sentencing factors do not have to be characterized by the trial court as aggravating or mitigating. (*People v. Brown, supra,* 33 Cal.4th at p. 402.) The use of adjectives in the sentencing statute and instruction such as "extreme" and "substantial" does not render either unconstitutional. (*Ibid.*)

■ The federal Constitution does not require juries to make written findings or achieve unanimity as to aggravating circumstances. (*People v. Brown, supra,* 33 Cal.4th at p. 402.)

■ California's death penalty law is not unconstitutional for not imposing a burden of proof on the prosecution to prove that death is the appropriate penalty. (*People v. Brown, supra,* 33 Cal.4th at p. 401.)

■ The federal Constitution does not require intercase proportionality review. (*People v. Brown, supra,* 33 Cal.4th at p. 402.)

■ The federal Constitution does not compel a trial court to instruct the jury that a sentence of life without possibility of parole actually means life without possibility of parole (*People v. Jones* (1997) 15 Cal.4th 119, 189–190 [61 Cal.Rptr.2d 386, 931 P.2d 960]), or to tell the jury there is a presumption that life without possibility of parole is the appropriate sentence (*People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980]).

## DISPOSITION

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied October 12, 2005.