Filed 4/21/16  P. v. Provencio CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SAMMY EDDIE PROVENCIO,<br><br>Defendant and Appellant. | F069577<br><br>(Super. Ct. No. 1452808)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Linda A. McFadden, Judge.

Peter Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Sammy Eddie Provencio (defendant) stands convicted, following a jury trial, of inflicting corporal injury resulting in a traumatic condition upon his spouse (Pen. Code, § 273.5, subd. (a); count I), making criminal threats (*id*., § 422; count II), and damaging or destroying a wireless communication device (*id*., § 591.5; count III). Following a bifurcated court trial, he was found to have suffered a prior domestic violence conviction (*id*., former § 273.5, subd. (e)(1)) and two prior serious felony convictions within the meaning of the three strikes law (Pen. Code, § 667, subd. (d)), and to have served three prior prison terms (*id*., § 667.5, subd. (b)). His motion to dismiss one of his prior convictions was denied, but the trial court struck one of the prior prison term enhancements. Defendant was sentenced to concurrent terms of 25 years to life on counts I and II, plus two years for the remaining enhancements, and was ordered to pay various fees, fines, and assessments.

On appeal, we hold the trial court did not abuse its discretion by denying defendant's motion for a mistrial; nor did it err by admitting a prior uncharged act of domestic violence. We further hold any error in the trial court's other challenged evidentiary rulings was harmless. Defendant must, however, be resentenced. The convictions are affirmed, but the case is remanded for resentencing

## FACTS

### I

#### PROSECUTION EVIDENCE

*The Charged Offenses*

Stephanie Provencio and defendant were wed in October 2009. Their son was born in 2011.[1]

---

**1** For clarity, we refer to Stephanie Provencio by her first name. No disrespect is intended.

On December 19, 2012, Stephanie and the child were visiting defendant for Christmas at the house in Ceres where defendant lived with Isaac Basaun and Priscilla Garza. Early that day, defendant yelled at Stephanie about her feeding their son cereal, then the argument escalated. Defendant punched Stephanie multiple times in the chest and pushed her down. Stephanie lay on the ground in a fetal position. She was afraid and did not know what else to do, because the child was right next to her.

As Stephanie lay there, defendant grabbed her by the hair and punched her in the back of the head several times. She "blacked out," and it took her a minute to realize what was going on. Defendant also kicked her legs. The child was crying, and defendant stopped and fell asleep.

Stephanie did not leave, because she was afraid. Right after the beating, defendant said that if she told on him, he would kill her and the boy. A few days earlier, she had tried to call her brother to pick her up, and defendant had grabbed her phone from her and thrown it at the wall, breaking the phone. After defendant fell asleep on December 19, however, Stephanie retrieved defendant's phone from where he had hidden it, snuck out of the room, and called her sister, Ruth Poyorena, who lived about four hours away. Stephanie called her instead of the police because she was afraid of defendant. Stephanie told her what happened and to do anything she could to get Stephanie out of there. Poyorena then called the police.[2]

---

[2] According to Poyorena, Poyorena was asleep when Stephanie called, so Stephanie left a voice message, saying she was just beaten up by defendant and to call the police. When Poyorena woke around 11:30 a.m. or 12:00 p.m., she heard the message and called Stephanie, who said she was "okay." An hour or so later, Poyorena called Stephanie again; again Stephanie said she was "okay." Poyorena called a third time about an hour later. She could heard defendant in the background. Poyorena asked if Stephanie wanted her to call the police. Defendant said, "Call the cops, by the time they get here, this bitch will be dead." As Stephanie said "yes" to Poyorena, the phone went dead. Poyorena called the Ceres police and gave them an address at which to check on Stephanie.

Officer Petersen arrived 15 or 20 minutes later, around 11:34 a.m.[3] Someone at the house warned defendant the police were there. As defendant was walking out the back door, he again told Stephanie that if she opened her mouth, he would kill her and her son.

Stephanie had contact with Petersen near the open garage door. There were a number of people outside. Stephanie was afraid because the people with whom she and her son were staying were friends of defendant. When Petersen asked if defendant lived there, Garza said she knew who he was, but he was not there. Petersen asked Stephanie if she knew who the reporting party was; she said no, but pointed to the house. Although Carvalho saw the gesture, Petersen returned to his patrol car and recontacted Poyorena to confirm he was at the correct address. Poyorena begged him to question more people. Carvalho eventually found defendant in the backyard, standing up against the house.

Petersen remained in the garage with Stephanie. As Carvalho took defendant, who was handcuffed, out to the patrol car, defendant said to Stephanie, "What the fuck? Did you call the cops? Tell them that we were just arguing." Petersen shielded Stephanie from defendant, but saw her lip was trembling. Defendant was still trying to communicate with Stephanie after Carvalho placed him in the patrol car.

Petersen subsequently interviewed Stephanie at the police station. Stephanie said she had been staying with her sister, but defendant wanted to spend Christmas with their son, and Stephanie was not going to send the child by himself. To Stephanie's knowledge, there was a stay-away order at that point, but not an active restraining order, and so it was permissible for her to let defendant see their son.[4]

---

[3] Petersen was dispatched to a security check call, with Poyorena as the original reporting party. Due to the type of call, a second officer — Officer Carvalho — was also dispatched.

[4] The order, which was made August 1, 2011, provided that defendant not harm or strike Stephanie, and that he not do anything to try to prevent or dissuade any victim or witness from testifying or attending any court proceeding.

Stephanie related that when she and the child first arrived at the house in Ceres on December 9, 2012, there was a lot of drinking involved. Garza and Basaun got into an altercation that became violent. Defendant tried to step in and ended up hitting Basaun in the mouth. When Stephanie tried to tell him not to get involved, defendant turned his anger on her. He punched her multiple times in the chest and on the wrists and he pulled her hair. Stephanie did not call the police, because she feared for her life.

After meeting with Petersen at the police station, where her injuries were photographed, Stephanie went to the emergency room because her head was throbbing.[5] She suffered from postconcussive syndrome and still had painful headaches as of the time of trial.

After defendant's arrest, Stephanie moved into a safe house and obtained a restraining order. Despite the order, defendant attempted to contact her by mail. In his letters, he told her that she did not have to testify. At one point, he warned her to "[s]tay the fuck away from the district attorney." Defendant also telephoned her numerous times from jail.[6] On one occasion, he apologized for the beating and said it would never happen again. He had made such promises several times before, and she had gotten back together with him.

---

[5] The photographs taken of Stephanie at the police station showed bruises sustained in both December 2012 incidents. Stephanie complained to Petersen of headaches and asked him to feel the side of her head. He was able to feel two knots or bumps. When Petersen spoke to Stephanie at the house, however, she initially said she did not need any medical treatment.

[6] One day, Stephanie had 127 missed calls from defendant. Mike Hermosa, an investigator for the district attorney's office, recorded several of the voice messages. In one, defendant said, "I'll go crazy on your ass. I'm a crazy mother fucker sometimes." All told, there were 1,346 calls made from the jail to Stephanie's cell phone number from December 19, 2012, the date defendant was arrested, until February 10, 2013, at which point Hermosa had the jail block calls to Stephanie's number. Stephanie received a "friend" request from defendant on Facebook three or four weeks before trial.

## *The Uncharged Prior Act*

Defendant beat Stephanie on her birthday in July 2011. She tried to call 911 as it was happening, but the phone was taken out of her hands. She sustained two black eyes and several bruises. For three days, Stephanie was "pretty much locked in the house" and could not leave. Her best friend came to the house several times because she knew Stephanie was there, but Stephanie was not allowed to open the door because of her black eyes. She sent her friend a text message, telling her what had happened. The friend immediately called the police, who arrived within 10 minutes.

When the officer arrived, he asked if defendant was home. Because she feared for her life, Stephanie responded aloud that she did not know where he was. However, she pointed at the closet in which he was hiding and mouthed that he was in there. Defendant was convicted of domestic violence as a result of the incident.

## II

### DEFENSE EVIDENCE

Carina Wasson had known defendant for years. She met Stephanie through him. Sometime in December 2012, around 7:00 p.m., Wasson was driving past the Foster Freeze in Ceres when she saw Stephanie involved in a fist fight with Alice Nichols. At some point, Stephanie said she loved defendant and wanted to get back with him. Defendant did not want to get back with her. Stephanie was upset because she felt defendant was spending too much time with Wasson's son, whose football team defendant helped coach. She wanted defendant to spend more time with her.[7]

---

[7] During the course of her testimony, Stephanie denied being in an altercation with Alice Nichols or any other female. She also denied being jealous defendant was living with Wasson.

Nichols testified in rebuttal and denied being in a fight with Stephanie. Nichols admitted "[s]omewhat" having a relationship with defendant in 2012. Sometimes she heard messages Stephanie left on defendant's cell phone. They were "screaming and yelling messages" in which Stephanie said if defendant did not do what she wanted, he

6.

## DISCUSSION

### I

### MISTRIAL MOTION

Defendant says the trial court erred by denying his motion for a mistrial.  We find no abuse of discretion.

**A.**     **Background**

On direct examination, the prosecutor questioned Stephanie about why she went to visit defendant in December 2012.  The following took place:

> "[PROSECUTOR]:  Q.  Was there an active restraining order?
>
> "A.  Not to my knowledge.  There was a stay-away order but not an active restraining order.
>
> "Q.  Okay.  But there was an order.  How did you understand the order?
>
> "A.  From my understanding, because *we had been to his parole officer before together*.
>
> "[DEFENSE COUNSEL]:  Objection.  Move to strike.
>
> "THE COURT:  Answer is stricken.  Jury is to disregard that answer.  [¶] . . . [¶]
>
> "(Bench conference had, not reported.)  [¶] . . . [¶]
>
> "Q.  Okay.  And when you first arrived from Lake Port to see him so Mr. Provencio could visit with the baby, what happened on that day?
>
> "A.  There was a lot of drinking involved.  The people that we were staying with got into an altercation.  It became violent.  Mr. Provencio tried to step in.  He actually ended up hitting Isaac Basaun in the mouth that day, punching him in the mouth.  I then was trying to tell Sammy that, you know, 'Don't get involved.  It's not your business, you' — because I knew *he was on parole*.

---

could not see his child.  Once, Nichols told Stephanie, over the phone, that Nichols had bought some shoes for the child.  Stephanie "talked crazy and yelled."

"[DEFENSE COUNSEL]:  Objection.

"THE COURT:  Sustained.

"[DEFENSE COUNSEL]:  Move to strike.

"THE COURT:  Answer stricken."  (Italics added.)

Later during direct examination, the prosecutor asked Stephanie about defendant telling her, in a phone call from jail, that he was sorry and it would never happen again. This ensued:

"Q.  And after he made those promises before, did you resume a relationship with him, did you get back together with him?

"A.  Yeah.

"Q.  Why?

"A.  I mean, I felt sorry for him.  He never had a family life.  He pretty much grew up — I don't know.  *He grew up locked up*.

"[DEFENSE COUNSEL]:  Objection.  Move to strike.

"THE COURT:  Sustained.  Stricken.  [¶] . . . [¶]

"(Bench conference had, not reported.)"  (Italics added.)

Outside the presence of the jury, defense counsel moved for a mistrial.  He argued the mentions of parole and defendant being locked up were prejudicial and could not be cured by instructions.  After noting defense counsel had requested a mistrial during the last bench conference, the court determined the questions asked by the prosecutor were not intentionally designed to elicit the responses given.  The court observed it had ruled defendant's prior criminal history, other than the domestic violence offense in 2011, would not be admissible unless defendant testified, but the jury did not learn why defendant was on parole and might assume it was for that offense.  The court pointed out it had admonished the jury to disregard the information, and offered to further instruct jurors if counsel wished.  It denied the motion for mistrial based on the references to

8.

parole, finding them "not unduly prejudicial" in light of the other evidence presented and "easily cured" by the court's instruction. As for the reference to being locked up, the court believed the jury might consider it as meaning defendant did not have a family life so was put in boarding homes or the like. The court agreed with defense counsel jurors could have inferred defendant was locked behind bars, but again found the testimony not "unduly prejudicial such that the jury couldn't disregard that, given the other testimony that's come in . . . ."

At the conclusion of evidence, the trial court instructed the jury, inter alia: "During the trial, attorneys objected to questions and move [*sic*] to strike answers given by witnesses. I ruled on the objections according to the law. If I sustain [*sic*] an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did. *If I ordered testimony stricken from the record, you must disregard it and not consider that testimony for any purpose.*" (Italics added.) The trial court subsequently confirmed defense counsel was not requesting any further limiting instruction specifically about the mention of parole.

## B.     Analysis

"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

"A witness's volunteered statement can, under some circumstances, provide the basis for a finding of incurable prejudice. [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.) "[E]xposing a jury to a defendant's prior criminality presents the possibility of prejudicing a defendant's case and rendering suspect the outcome of the

9.

trial. [Citations.]" (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1580-1581; see *People v. Stansbury* (1993) 4 Cal.4th 1017, 1060, revd. on another ground by *Stansbury v. California* (1994) 511 U.S. 318.)

Here, there is no suggestion the prosecutor deliberately sought to elicit the offending testimony. The trial court immediately struck the testimony and admonished the jury to disregard it. It reiterated the admonition during the giving of jury instructions. We presume jurors followed these instructions. (*People v. Cox* (2003) 30 Cal.4th 916, 961, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see *Greer v. Miller* (1987) 483 U.S. 756, 766, fn. 8.) In light of the evidence presented at trial, including that defendant previously was convicted of domestic violence the jury was permitted to consider as evidence he was disposed to commit domestic violence, the trial court did not abuse its discretion by denying the mistrial motion. (See, e.g., *People v. Alexander* (2010) 49 Cal.4th 846, 914-915 [mistrial motion properly denied; jurors presumed to act in accordance with instruction to disregard witness's reference to the defendant's previous involvement in triple murder]; *People v. Avila* (2006) 38 Cal.4th 491, 571-574 [same re: witness's statement the defendant had recently gotten out of prison]; *People v. Bolden* (2002) 29 Cal.4th 515, 554-555 [trial court did not err in ruling the defendant's chances of receiving fair trial were not irreparably damaged, such that mistrial was warranted, where police officer testified to obtaining the defendant's address from parole office]; see also *People v. Marshall* (1996) 13 Cal.4th 799, 837-839 [no reversible error where trial court denied mistrial motion based on, but inadvertently failed to strike, witness's reference to the defendant being ex-felon].)[8]

---

**8**   The cases on which defendant relies are manifestly distinguishable. (E.g., *Bruton v. United States* (1968) 391 U.S. 123, 135-136 [instruction to disregard evidence insufficient where "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial"]; *People v. Wagner* (1975) 13 Cal.3d 612, 621 [instruction that questions were not evidence and to disregard inferences from questions insufficient

## II

### EVIDENTIARY RULINGS

Defendant raises claims of error with respect to several of the trial court's evidentiary rulings. We conclude any error was harmless.

### A.    **Prior Domestic Violence**

#### 1.    Background

The prosecutor moved for admission, under Evidence Code section 1109, of defendant's 2011 commission of domestic violence upon Stephanie.[9] During the hearing on in limine motions, the trial court observed it would hear any offers of proof, and hold a section 402 hearing if necessary, outside the jury's presence. It observed, however, that the proffered evidence likely was more probative than prejudicial, "viewing weighing factors under Penal Code [*sic*] Section 352." After hearing the prosecutor's offer of proof, the court stated its inclination was "to allow the one from 2011, because it shows obviously propensity for violence, which is what 1109 [*sic*]. It is very relevant here and probative, and not any more damaging to defense than the current charges here. And it does show her fear of the defendant because she's not telling the officer that he's hiding in the closet. And it does go to a reason for her being afraid of the defendant. Two black eyes in the past." The court subsequently ruled it would admit the evidence over defense counsel's section 352 objection, and reiterated it was more probative than prejudicial. The court additionally ruled the resulting conviction would also be admitted.

The evidence adduced concerning the 2011 incident is set out in the statement of facts, *ante*. Jurors subsequently were instructed that if the prosecutor proved the uncharged domestic violence by a preponderance of the evidence, they could (but were

---

where prosecutor repeatedly and improperly insinuated he had source of information unknown to jury that corroborated truth of questions suggesting the defendant was involved in extensive, uncharged criminal activity].)

[9]    Further statutory references are to the Evidence Code unless otherwise stated.

11.

not required to) conclude defendant was disposed to commit domestic violence and, based on that decision, also conclude he was likely to commit and did commit the offenses charged in counts I and II.

2.      Analysis

Subdivision (a)(1) of section 1109 provides that, with exceptions not pertinent here, "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

In *People v. Brown* (2011) 192 Cal.App.4th 1222, 1232-1233, we set out the applicable law:

> " 'Evidence of prior criminal acts is ordinarily inadmissible to show a defendant's disposition to commit such acts.  (Evid. Code, § 1101.)  However, the Legislature has created exceptions to this rule in cases involving sexual offenses (Evid. Code, § 1108) and domestic violence (Evid. Code, § 1109).'  [Citation.]  '[T]he California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence.'  [Citation.]  Section 1109, in effect, 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes.  [Citation.]'  [Citations.]  '[I]t is apparent that the Legislature considered the difficulties of proof unique to the prosecution of these crimes when compared with other crimes where propensity evidence may be probative but has been historically prohibited.'  [Citation.]  [¶] . . . [¶]

> "Even if the evidence is admissible under section 1109, the trial court must still determine, pursuant to section 352, whether the probative value of the evidence is substantially outweighed by the probability the evidence will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury.  [Citation.]  The court enjoys broad discretion in making this determination, and the court's exercise of discretion will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious or patently

absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" (Fn. omitted.)

Defendant first says the 2011 incident does not meet the standard of admissibility under section 1109. Subdivision (d)(3) of section 1109 defines " '[d]omestic violence' " as having the meaning set out in section 13700 of the Penal Code and section 6211 of the Family Code. Each of those code sections defines " '[d]omestic violence' " as abuse committed or perpetrated against a spouse or former spouse. (Fam. Code, § 6211, subd. (a); Pen. Code, § 13700, subd. (b).) Subdivision (a) of Penal Code section 13700 further defines " '[a]buse' " as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." There can be no doubt the 2011 incident constituted "domestic violence." (See *People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138-1139.)

Defendant asserts "there was insufficient weighing of the prejudicial effect versus the probative value in the case." "Section 1109 conditions the introduction of prior domestic violence evidence on an evaluation under section 352 of whether the evidence is more probative than prejudicial. A careful weighing of prejudice against probative value under that section is essential to protect a defendant's due process right to a fundamentally fair trial. [Citations.]" (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1313-1314.) Here, the record clearly shows the trial court performed the requisite balancing function. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1336; *People v. Prince* (2007) 40 Cal.4th 1179, 1237.)

Defendant's true argument appears to be that the evidence should have been excluded under section 352.[10] " 'When an objection to evidence is raised under . . .

_____

**10** Defendant says he is challenging the evidence *and* the related jury instruction. He claims both were "inadmissible and caused extreme prejudice to" his case. We are unsure how a jury instruction can be "inadmissible." In any event, defendant fails to point to any deficiency in the standard instruction given by the trial court, except that it

13.

section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers "*substantially outweigh*" probative value, the objection must be overruled. [Citation.]' " (*People v. Hart* (1999) 20 Cal.4th 546, 606, italics added.)

"[T]here is a strong presumption in favor of admitting [domestic violence] evidence under . . . section [1109] to show propensity to commit charged crimes. [Citation.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 62.)[11] Here, the trial court properly could conclude this presumption was not overcome. The probative value of the prior domestic violence evidence was high, particularly in light of the fact it involved an assault with fists on the same victim and was not remote in time from the charged offense. (See *People v. Guilford* (2014) 228 Cal.App.4th 651, 661-662; *People v. Poplar*, *supra*, 70 Cal.App.4th at p. 1139; see also *People v. Falsetta* (1999) 21 Cal.4th 903, 917.)

The probative value of the evidence was not substantially outweighed by dangers of prejudice, confusion, and/or undue time consumption. The pertinent testimony consumed only a few pages of trial transcript. Defendant complains that the potential for prejudice was "great" because, while the jury learned defendant had been *convicted* for the prior domestic violence, no evidence was presented he had been *punished* for it. (See

---

allowed consideration of evidence defendant says should not have been admitted. Accordingly, our resolution of his challenge to the evidence necessarily subsumes his challenge to the instruction, and so we do not further discuss the latter.

[11] Although both *Merriman* and the case on which it relies — *People v. Loy* (2011) 52 Cal.4th 46, 62 — address section 1108, they inform our analysis. As we have explained, "Sections 1108 and 1109 are 'complementary portions of the same statutory scheme.' [Citation.] Section 1108, which allows admission of evidence of uncharged sexual offenses, and section 1109, allowing admission of evidence of uncharged domestic violence, are 'virtually identical,' and cases which have interpreted section 1108 have been relied upon to resolve similar issues involving section 1109. [Citations.]" (*People v. James* (2010) 191 Cal.App.4th 478, 482, fn. 2.)

14.

*People v. Jennings*, *supra*, 81 Cal.App.4th at p. 1315.) We agree with the Attorney General that the jury likely inferred defendant, having been convicted, incurred some form of punishment. This was not a situation in which defendant's prior criminal conduct did not result in a criminal conviction, thus increasing the danger the jury in the present case might be inclined to punish defendant for the uncharged misconduct. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

Defendant also complains the two offenses were not substantially similar since the prior incident involved defendant keeping Stephanie locked up for three days, while the charged incident did not. The two incidents were " 'similar in character,' " however (*People v. Johnson* (2010) 185 Cal.App.4th 520, 532), and the trial court reasonably could conclude dissimilarities in the details did not lessen the probative value of the uncharged offense to show defendant's propensity to commit domestic violence or increase its potential for prejudice.

Defendant says another factor in the section 352 analysis is how difficult it is for defendant to defend against the uncharged offense. (*People v. Falsetta*, *supra*, 21 Cal.4th at p. 917.) He says here it was extremely difficult, because defendant and Stephanie were the only witnesses to the 2011 incident. Since defendant was convicted of the uncharged offense, however, we question the extent to which he was required to defend against it. Moreover, he and Stephanie were also the only witnesses (other than a young child) to the incident that gave rise to the charged offenses. If anything, this fact made evidence defendant had a propensity to commit domestic violence against Stephanie even more probative than it might have been had there been other eyewitnesses to the charged offenses.

Finally, defendant argues the facts of the prior incident were "substantially more egregious than the present incident," because defendant kept Stephanie locked up for three days. We do not consider an incident resulting in two black eyes and some bruises

15.

to be substantially more egregious than one resulting in postconcussive syndrome and the victim still having migraine-like headaches over a year later.

Where section 352 is concerned, "[t]he word 'prejudicial' is not synonymous with 'damaging.' [Citation.] Rather, evidence is unduly prejudicial under section 352 only if it ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual and . . . has very little effect on the issues' " ' [citation], or if it invites the jury to prejudge ' " 'a person or cause on the basis of extraneous factors.' " ' [Citation.] 'Painting a person faithfully is not, of itself, unfair.' [Citation.]" (*People v. Johnson*, *supra*, 185 Cal.App.4th at p. 534.)

In the present case, "[t]he evidence was extremely probative, showing defendant's propensity for violence against [Stephanie]. The prior incident[] of domestic violence [was] not the sort to evoke an emotional bias against defendant. [Citation.]" (*People v. Poplar*, *supra*, 70 Cal.App.4th at p. 1139.) The trial court did not abuse its discretion in admitting the evidence of the 2011 incident.

## B.     Evidence Related to Stephanie's Credibility

### 1.     Background

On cross-examination, Stephanie admitted she had given a false statement to a police officer in the past to protect defendant. Although she initially denied ever lying under oath, she ultimately admitted testifying in a hearing resulting from the officer's report that defendant did not do anything to her and the Woodland Police Department coerced her into saying things about defendant.[12]

Asked on redirect examination why she lied to the police, Stephanie explained that three days after her birthday in July 2011, there was a knock on her door and two males essentially forced their way inside. Stephanie's cousin and elderly uncle were present.

---

[12]     In his cross-examination, defense counsel identified the police report as being made in 2010 and the resulting hearing being in November of that year.

16.

Stephanie knew one of the men as "Buckshot" and the other as "Money Mike." One of the men lifted his shirt and showed he had a gun. They said defendant had been trying to contact Stephanie.

At this point in Stephanie's testimony, defense counsel objected on hearsay grounds. The prosecutor responded the statement went to the effect on the listener or hearer. The trial court overruled the objection, but cautioned jurors that the statements were being admitted "only for the purpose of showing what effect they may have had on the witness, not for the proof of the matter asserted . . . ."

The prosecutor then asked Stephanie what the men told her. Stephanie testified they said defendant had been trying to contact her, and she needed to answer the phone. She further testified her cousin and uncle told the men the baby was "right here." This elicited another hearsay objection from defense counsel, which the trial court overruled, stating, "It's not offered for the truth." Stephanie testified "we" told the men, " 'My son's right here. No. Don't do this in front of my son.' And there was arguing for about 20 minutes. And then they finally left."

Stephanie explained this incident made her feel threatened. She was afraid to tell the police and did not do so that day, but she had done so since then. With respect to the case in 2011, Stephanie was scared and did not want to lose her son or her life, so she made up a story to get defendant "off the hook."

The prosecutor subsequently called Hermosa to testify concerning his recording of some phone calls defendant made to Stephanie from jail. At one point, Hermosa testified that he picked Stephanie and her children up outside the area the Tuesday preceding Hermosa's testimony and, while driving to Modesto, Stephanie mentioned to him that she received a Facebook friend request from defendant.

The prosecutor then asked if Stephanie ever mentioned being intimidated or dissuaded from testifying in another case. Defense counsel's objection that the question was leading was overruled. When defense counsel then asserted he had no discovery, the

17.

prosecutor responded, "It's response to questions asked by defense of the victim." The court allowed Hermosa to answer. He testified Stephanie mentioned something about a prior case in which defendant was arrested. A friend of defendant's threatened her, so she did not follow through on it. She regretted not pursuing it. Hermosa received the impression it was an adjudicated case. He did not remember when it happened, but it may have been a couple years before the present case. Defense counsel's objection on "lack of hearsay," section 352, and discovery violation grounds was overruled.

The prosecutor then asked if Stephanie ever mentioned something about an armed man coming to her house and telling her not to testify. Defense counsel stated, "Again, objection, Your Honor," but the objection was overruled. Hermosa testified he could not remember the "armed part," but he remembered Stephanie was threatened. He stated he could not recall, as the conversation would have been a year or so ago. Defense counsel then elicited that the conversation about the armed men was not in any of the reports Hermosa submitted to the district attorney's office.

The court later memorialized bench conferences that had occurred. It explained it overruled defense counsel's objection regarding statements Stephanie made to Hermosa about prior intimidation, "because the allegation was that those were recently fabricated. At least there was an inference that those were recently fabricated. So there's statements to the investigator while they were driving down here going toward rebuttal to recent fabrication . . . ."

The trial court subsequently instructed the jury that among the things it could consider in evaluating a witness's credibility was whether the witness made a statement in the past that was consistent or inconsistent with his or her testimony. The court also instructed that evidence admitted for a limited purpose could only be considered for that purpose.

In her opening argument to the jury, the prosecutor discussed letters defendant sent to Stephanie, trying to convince her not to testify. The prosecutor remarked:

18.

"[Stephanie] admitted to you that she lied in the past. She admitted to you in 2010 she said nothing happened because two people came to her house, one had a gun, and they told her not to testify. [¶] You heard in 2011 she was not cooperative with the police because she was stuck in the cycle. But now that's [*sic*] going to be held against her or now is she able to escape, her silence broken."

Defense counsel subsequently argued to the jury:

"Now I want to talk about credibility. Stephanie Provencio is a liar. She told several lies in this courtroom. The first lie she said when I was asking cross-examination, she said she never lied under oath. And then I brought up the hearing in November 2010, and then she had to admit that, yeah, she did tell a lie . . . . And at that hearing in 2010 she made a false statement under oath stating the Woodland Police Department made her, coerced her to say those things. She admitted that in court. That's an admitted liar. So cannot believe anything she says.

"Now, after she's caught in a lie, she tried to explain it; right. She came back with the story, oh, there was two men, armed men, in my house that made me — that threatened me. Well, did she report it to anybody? It was two years later, no, she never reported it to anybody. But it so happens on the way — on her ride down here, when she was getting escorted by investigator, she happened to drop it in his ear two years later . . . . She was trying to put another nail in his coffin. She just lies when it's to her benefit.

"Now, in regard to that statement about the two armed men, she also lied to you in court. On direct examination she said several people were there in the room; right? And she said her mother was there. And on cross-examination I asked her was your mother there, and she changed it. You know why she changed her story? Because she knew that we knew when her mother died, and she changed her story right in front of us. She lied right in front of your face."

The prosecutor responded:

"The defense brought up the prior lies made by the victim. When the victim took the stand, she stated that all of her lies in the past have been to protect [defendant]. They've been told to recant, they've been told to officers because she doesn't want anything to happen because she's afraid of [defendant].

19.

"She stated that at a prior incident there were two men that came to her house, one armed, one was not, and intimidated her. And that's not something she stated for the first time on the stand like that was argued. When she was being transported down with . . . Hermosa, she made mention of it. And . . . Hermosa confirmed that, yes, on the way here before she even took the stand, she made mention of that. And he didn't draft any report because it was in reference to something that happened in years past, an adjudicated case."

2.    Analysis

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (§ 1200, subd. (a).) Except as provided by law, it is inadmissible. (*Id.*, subd. (b).)

Defendant contends the trial court erred by permitting the prosecutor to bolster Stephanie's testimony with evidence of her prior consistent statement to Hermosa. "A prior consistent statement is admissible as an exception to the hearsay rule if it is offered after admission into evidence of an inconsistent statement used to attack the witness's credibility and the consistent statement was made before the inconsistent statement, or when there is an express or implied charge that the witness's testimony was recently fabricated or influenced by bias or improper motive, and the statement was made before the fabrication, bias, or improper motive. (Evid. Code, §§ 791, 1236.)" (*People v. Kennedy* (2005) 36 Cal.4th 595, 614, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

" ' "[R]ecent fabrication may be inferred when it is shown that a witness did not speak about an important matter at a time when it would have been natural for [her] to do so," and in such a circumstance, "it is generally proper to permit rehabilitation by a prior consistent statement." [Citations.]' [Citations.]" (*People v. Lopez* (2013) 56 Cal.4th 1028, 1066, overruled on another ground in *People v. Rangel* (Mar. 28, 2016, S076785) __Cal.4th__ [2016 Cal. Lexis 1816, *37-*38].) Section 791 "permits the admission of a prior consistent statement when there is a charge that the testimony given is fabricated or

20.

biased, not just when a particular statement at trial is challenged. [Citations.]" (*People v. Kennedy*, *supra*, 36 Cal.4th at p. 614.)

Defendant contends there was no implication at trial that Stephanie fabricated her account of the prior incident; rather, defense counsel attempted to establish Stephanie previously lied in court and so her testimony in general was suspect. Defendant also says the prosecution failed to show that when Stephanie first implicated defendant, any improper motive or bias had not yet arisen. We are not certain we agree with defendant. Arguably, however, the prosecution failed to demonstrate Stephanie's statement was made before any motive for fabrication or bias arose. (See *People v. Hamilton* (1989) 48 Cal.3d 1142, 1168.)

Defendant also contends the trial court erred by permitting Stephanie to recount statements she, her uncle, and her cousin made to Buckshot and Money Mike about her baby's presence. He argues that if the statements were admissible for a nonhearsay purpose, they nevertheless were irrelevant and should have been excluded under section 352.

Defendant raised only hearsay objections to this evidence at trial. Accordingly, he has forfeited any claim the evidence was irrelevant or more prejudicial than probative under section 352. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 409; *People v. Flores* (1992) 7 Cal.App.4th 1350, 1359-1360; see § 353, subd. (a); *People v. Waidla* (2000) 22 Cal.4th 690, 717.) To the extent he now suggests the prosecutor committed misconduct by intentionally asking questions calling for inadmissible and prejudicial answers (see, e.g., *People v. Pitts* (1990) 223 Cal.App.3d 606, 734), the lack of objection on this ground likewise results in forfeiture (*People v. Lancaster* (2007) 41 Cal.4th 50, 81-82; see *People v. Foster*, *supra*, 50 Cal.4th at pp. 1350-1351).[13]

---

[13]    Despite the California Supreme Court's caveat that "a defendant cannot automatically transform a forfeited claim into a cognizable one merely by asserting ineffective assistance of counsel" (*People v. Thompson* (2010) 49 Cal.4th 79, 121,

21.

"An out-of-court statement is properly admitted if a nonhearsay purpose for admitting the statement is identified, and the nonhearsay purpose is relevant to an issue in dispute. [Citations.]" (*People v. Turner* (1994) 8 Cal.4th 137, 189, overruled on another ground in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.) One such nonhearsay purpose is to show the statement "imparted certain information to the hearer, and . . . the hearer, believing such information to be true, acted in conformity with such belief. [Citation.]" (*People v. Montes* (2014) 58 Cal.4th 809, 863.) Such evidence is not hearsay, since the hearer's reaction to the statement, not the truth of the matter asserted, is the relevant fact sought to be proved. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1162; *People v. Thornton* (2007) 41 Cal.4th 391, 447.)

Here, the incident involving Buckshot and Money Mike was relevant to Stephanie's state of mind, both with regard to that incident and, to at least some extent, with respect to the "sustained fear" element of the current criminal threats (Pen. Code, § 422) charge. (See *People v. Scalzi* (1981) 126 Cal.App.3d 901, 907.) Statements regarding the baby's presence were part of the overall incident.

Assuming the trial court abused its discretion by admitting the statements about the baby and/or Stephanie's statements to Hermosa, however, the error was harmless, because no "reasonable probability exists that the jury would have reached a different result had this evidence been excluded. [Citations.]" (*People v. Whitson* (1998) 17

---

fn. 14), defendant attempts to do just that, claiming that if defense counsel should have made a different objection, the failure to do so constituted ineffective assistance of counsel. Defendant has failed to comply with rule 8.204(a)(1)(B) of the California Rules of Court. Moreover, other than a bare proclamation that, having made an objection on one ground, trial counsel could have had no tactical reason for failing to object on a more appropriate ground (and citation to a single case as authority solely for that proposition), he does not expand on the issue with either argument or citation to authority pertinent to review of an ineffectiveness claim on direct appeal. Accordingly, we decline to address the issue. (See *People v. Hardy* (1992) 2 Cal.4th 86, 150.) Were we to do so, we would conclude defendant has failed to make the requisite showing, particularly with respect to prejudice. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1003.)

Cal.4th 229, 251; see *ibid.* [applying standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) to erroneous admission of evidence]; accord, e.g., *People v. Seumanu* (2015) 61 Cal.4th 1293, 1308; *People v. Fuiava* (2012) 53 Cal.4th 622, 671; *People v. Arias* (1996) 13 Cal.4th 92, 153.) Defendant attempts to paint this case as a close one, but it was not. Uncontradicted evidence showed defendant sought to avoid the police when Petersen and Carvalho arrived, and that he demanded a bruised Stephanie say he and she were "just arguing." Defendant had already shown a propensity for committing domestic violence against Stephanie that involved striking her in the face and head. Wasson's testimony about seeing a fistfight between Stephanie and Nichols was weakened by the failure to establish precisely when in December 2012 this occurred, Wasson's failure to stop to see if Stephanie (who was "[s]omewhat" of a friend) needed help or to notify defendant or the police, her failure to contact police when she learned defendant was facing charges in this case, and the lag between when she first told anyone of the fight and when she named Nichols as the person involved in it with Stephanie. In addition, Nichols denied being in a fight with Stephanie on December 18, 2012. With respect to the statements about the baby's presence, the trial court admonished jurors of the limited purpose for which the evidence could be considered. We presume, as we must, jurors heeded the instruction (*People v. Turner*, *supra*, 8 Cal.4th at p. 190; *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17), and nothing in the record rebuts this presumption (*People v. Merriman*, *supra*, 60 Cal.4th at p. 71). Significantly, the jury deliberated for less than three hours, which included a reread of Hermosa's testimony and possibly lunch.[14]

---

[14] Because Hermosa's testimony included telephone calls defendant made to Stephanie from jail, the jury's request to have his testimony reread does not indicate jurors were focused on Stephanie's statement to him concerning the prior incident of intimidation.

23.

In light of the record as a whole, including the quantity and quality of admissible evidence, the challenged testimony was "inconsequential," even assuming it had some incrementally bolstering effect on Stephanie's credibility. (See *People v. Davis* (2005) 36 Cal.4th 510, 538.) This is so despite the fact the prosecutor touched briefly on the evidence during her summation to the jury. (See *People v. Johnson* (1992) 3 Cal.4th 1183, 1220; cf. *People v. Duarte* (2000) 24 Cal.4th 603, 618-619 [erroneous admission of hearsay prejudicial under *Watson* where prosecution's case depended "heavily" on challenged evidence]; *People v. Powell* (1967) 67 Cal.2d 32, 55 [erroneous admission of statements prejudicial where evidence constituted "prominent feature" of People's case-in-chief, introduction occupied substantial portion of trial, and prosecutor repeatedly stressed incriminating value].) Defendant's claim the prosecutor "emphasized" the evidence in closing argument is a gross misstatement of the record more akin to wishful thinking than reality.

## C.     Lay Opinion

### 1.     Background

Petersen testified that when he arrived on scene in response to the request for a security check, Garza told him defendant was not there. He then saw Stephanie exit the door leading from the house into the garage. This ensued:

> "Q. [by the prosecutor:] What did you notice about her?
>
> "A. She wasn't vocalizing or verbalizing anything. It was just kind of she had that worried look but —
>
> "Q. And, for the record, you've made some motions with your eyes and lips, sort of indicating some type of worried look?
>
> "A. Worried look, panicked.
>
> "[DEFENSE COUNSEL]: I'm going to object. Speculation.
>
> "[PROSECUTOR]: It's lay opinion testimony.

"THE COURT: Overruled.

"[DEFENSE COUNSEL]: Relevance. Relevance. Irrelevant.

"THE COURT: Okay. Overruled."

The trial court ultimately instructed the jury: "A witness or witnesses gave their opinions during the trial. You may, but are not required, to accept the opinions as true or correct. You may give the opinion whatever weight you think appropriate. Consider the extent of the witness' opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion and the facts or information on which the witness relied in forming that opinion. [¶] You must decide whether information on which the witness relied was true and accurate. You may disregard all or any part of an opinion that you find unbelievable, unreasonable or unsupported by the evidence."

Defendant claims the trial court erred in permitting the testimony Stephanie looked "panicked." He says Petersen instead should have been required to describe the physical symptoms he observed. We conclude the trial court did not err.

2.     Analysis

"If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." (§ 800.)[15]

Under the foregoing statute, " '[a] lay witness may express an opinion based on his or her perception, but only where helpful to a clear understanding of the witness's testimony [citation], "i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed." [Citation.]' [Citation.] Such a situation may arise when

---

[15]     Although defendant did not object at trial on the ground of improper lay opinion, we conclude the trial court was sufficiently alerted to the issue by the objection actually made and the prosecutor's response thereto. The issue thus is reviewable on appeal. (See *People v. Clark* (1992) 3 Cal.4th 41, 124, overruled on another ground in *People v. Pearson* (2013) 56 Cal.4th 393, 462.)

25.

a witness's impression of what he or she observes regarding the appearance and demeanor of another rests on 'subtle or complex interactions' between them [citation] or when it is impossible to otherwise adequately convey to the jury the witness's concrete observations. [Citations.]" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 130.) In other words, section 800 "merely requires that witnesses express themselves at the lowest possible level of abstraction. [Citation.] Whenever feasible 'concluding' should be left to the jury; however, when the details observed, even though recalled, are 'too complex or too subtle' for concrete description by the witness, he may state his general impression. [Citation.]" (*People v. Hurlic* (1971) 14 Cal.App.3d 122, 127.) Moreover, the "opinion need only be 'helpful' — rather than necessary — to understanding the witness's testimony. [Citation.]" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1306, fn. 11.) "Admission of lay opinion testimony is within the discretion of the trial court and will not be disturbed 'unless a clear abuse of discretion appears.' [Citations.]" (*People v. Mixon* (1982) 129 Cal.App.3d 118, 127; accord, *People v. DeHoyos*, *supra*, 57 Cal.4th at p. 131.)

Defendant has failed to establish an abuse of discretion. The trial court and jurors were able to observe Petersen's facial expressions, and the trial court could determine whether Petersen's impression of Stephanie's expression rested on subtle or complex details that could not be described in a concrete manner, so that Petersen's opinion — which clearly was based on his perceptions — helped jurors better understand his testimony. (See *People v. Hinton* (2006) 37 Cal.4th 839, 889; *People v. Kennedy*, *supra*, 36 Cal.4th at p. 621.)

### III

### SENTENCING

Under the three strikes law as originally enacted, a recidivist with two or more prior convictions for serious or violent felonies, who was convicted of *any* new felony, was subject to an indeterminate term of 25 years to life in prison. (Pen. Code, former

§§ 667, subds. (d), (e)(2), 1170.12, subds. (b), (c)(2); *People v. Yearwood* (2013) 213 Cal.App.4th 161, 167 (*Yearwood*).) On June 2, 2014, defendant was sentenced, on counts I and II, to two concurrent terms of 25 years to life on this basis.

However, "[o]n November 6, 2012, the voters approved Proposition 36, the Three Strikes Reform Act of 2012, which amended [Penal Code] sections 667 and 1170.12 and added [Penal Code] section 1170.126." (*Yearwood*, *supra*, 213 Cal.App.4th at p. 167.) Penal Code section 1170.126 (hereafter the Act), which went into effect November 7, 2012 (Cal. Const., art. II, § 10, subd. (a)), "change[d] the requirements for sentencing a third strike offender to an indeterminate term of 25 years to life imprisonment. . . . The Act diluted the three strikes law by reserving the life sentence for cases where the current crime is a serious or violent felony or the prosecution has pled and proved an enumerated disqualifying factor. *In all other cases, the recidivist will be sentenced as a second strike offender.* [Citations.]" (*Yearwood*, *supra*, at pp. 167-168, italics added.)

*Yearwood* made clear that a defendant whose current felony is not a strike offense and who is sentenced after the Act's effective date, will not be sentenced to an indeterminate life term. (*Yearwood*, *supra*, 213 Cal.App.4th at p. 168.) Defendant's current conviction for violating Penal Code section 273.5, subdivision (a) is not a strike offense, as it is not a serious felony as defined in section 1192.7, subdivision (c) of the Penal Code, or a violent felony as defined in section 667.5, subdivision (c) of that code. Yet, despite the fact defendant not only was sentenced after the Act's effective date but committed the offense after that date, he was sentenced according to pre-Act law. As the Act was already in effect on all pertinent dates, he was entitled to be sentenced pursuant to its provisions, as the Attorney General recognizes.[16]

---

[16] The record on appeal contains no explanation for the error. Although both parties filed sentencing statements, and defendant even asked the court to strike one of his prior convictions, neither of them mentioned the Act, nor did the court or probation officer.

27.

Defendant was convicted, in count II, of violating Penal Code section 422. Because a violation of that statute is defined as a serious felony (Pen. Code, § 1192.7, subd. (c)(38)), defendant properly received an indeterminate term of 25 years to life in prison on that count. As to count I, however, since none of the statutory exceptions were applicable, he should have been sentenced as a second strike offender. (Pen. Code, §§ 667, subd. (e)(2)(C), 1170.12, subd. (c)(2)(C); see *People v. Johnson* (2015) 61 Cal.4th 674, 690 [post-Proposition 36, individual convicted of serious or violent felony and felony that is neither serious nor violent will receive sentence of at least 25 years to life for former and, absent statutory exception, two-strike sentence for latter].)[17]

---

[17] Defendant operates under the assumption that with respect to count I, he is eligible for a recall of sentence and resentencing under Penal Code section 1170.126. He says "the result is the same" whether reached by his analysis or that of the Attorney General, who recognizes defendant was entitled to be sentenced under the three strikes law, as amended by the Act, in the first instance. Defendant misapprehends the law, and the result is *not* the same. Penal Code section 1170.126 provides a postconviction release proceeding for persons "presently serving an indeterminate term of imprisonment [under the three strikes law as enacted], whose sentence under [the Act] would not have been an indeterminate life sentence." (Pen. Code, § 1170.126, subd. (a).) The only reasonable interpretation of this provision is that section 1170.126 of the Penal Code applies to persons lawfully sentenced to an indeterminate term prior to the Act's effective date. (See *Yearwood*, *supra*, 213 Cal.App.4th at p. 168.) Defendant was erroneously sentenced to such a term on count I. Were his analysis correct, he might or might not be resentenced to a second strike term on that count, depending on whether the trial court determined resentencing him "would pose an unreasonable risk of danger to public safety." (Pen. Code, § 1170.126, subdivision (f).) "Such a discretionary finding is a component of [Penal Code] section 1170.126 but not [Penal Code] sections 667 and 1170.12, as amended [by the Act]" (*Yearwood*, *supra*, at p. 168), and, given defendant's record and penchant for violence, the trial court might well decline to reduce his sentence. Because defendant was entitled to be sentenced as a second strike offender on count I in the first instance, without regard to Penal Code section 1170.126, defendant does not run that risk.

## **DISPOSITION**

The judgment of conviction is affirmed.  The sentence is vacated and the matter is remanded for resentencing.

_____
DETJEN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
FRANSON, J.